## JAMES LICK v. WILLIAM FAULKNER and GEORGE L. FAULKNER.

TREASURY NOTES—BILLS OF CREDIT.—The Constitution of the United States confers upon Congress the power to issue treasury notes or bills of credit—not in

Lick *v.* Faulkner *et al.*

express terms, but as a power necessarily implied—whenever Congress in its wisdom shall determine that it is necessary to issue them in order to carry into effect a power expressly granted.

TREASURY NOTES A LEGAL TENDER.—The Act of Congress of February 25, 1862, authorizing treasury notes to be issued, and making them lawful money and a legal tender in payment of debts, was an exercise of sovereign authority within the scope of the powers granted in the Constitution, "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions," and "to raise and support an army," and "to provide and maintain a navy."

POWERS OF CONGRESS.—Whenever an express power is granted to Congress in the Constitution of the United States, the choice of the *means* by which the power expressly granted is to be carried into effect is left to the wisdom of Congress, with only this qualification : that the means adopted must bear a relation in the nature and fitness of things to the end to be accomplished.

TREASURY NOTES A LAWFUL TENDER.—The making of treasury notes lawful money, and a legal tender in payment of debts, is one of the *means* which Congress may constitutionally adopt to enable the General Government "to raise and support an army, to provide and maintain a navy," and "to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions."

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

This action was brought to recover the sum of four hundred and fifty dollars, due from the defendants to the plaintiff for the rent of a store in the City of San Francisco. The rent was two hundred and twenty-five dollars per month, and the sum sued for accrued for the months of September and October, 1862. The defendants in their answer admitted their indebtedness, but set up that after the same had accrued, and before the commencement of the action, they tendered to plaintiff the amount in United States notes, issued by virtue of an Act of Congress, entitled "An Act to authorize the issue of United States notes, and for the redemption or funding thereof, and for funding the floating debt of the United States," approved February 25, 1862, and that the plaintiff refused to receive the same. Upon the commencement of the action the defendants brought the notes into Court and deposited them in the Clerk's office, ready to be delivered to plaintiff when he would accept of the same.

Plaintiff demurred to the defense set up in the answer, and

the Court overruled the demurrer. The cause was tried by the Court.

The Court found the matters stated in the pleadings to be true, and gave plaintiff judgment for the amount of the debt, and defendants judgment for their costs.

Plaintiff appealed.

*H. H. Haight*, for Appellant.

There are certain rules and maxims applicable to the interpretation of the Federal Constitution, which it may be well, first, briefly to advert to.

The Federal Government, to quote the language of Mr. Chief Justice Marshall, is acknowledged by all to be one of enumerated powers. (*McCullough* v. *State of Maryland*, 4 Wheat. 316.)

That it can exercise only the powers granted to it, is, as he says, universally admitted. This rule of construction of the Federal Constitution, first judicially declared by Mr. Chief Justice Marshall, (himself a Federalist,) has been sanctioned by all the eminent men of all parties who participated in framing the system, and have shared in its administration.

" The Constitution of the United States is a grant, not a limitation of power ; Congress can exercise no power not expressly delegated." (Sedgwick, p. 589 ; 11 Peters, 316.)

" It is to receive a reasonable interpretation of its language and its powers, not *straining* its words beyond their *common* and *natural sense ;* but giving their exposition a fair and just latitude, taking into view the *antecedent* situation of the country, and its institutions, *cotemporary history, cotemporary interpretation,* and *practical exposition*"—that is, the practice of the Government. (Quotations from Judge Story, Sedgwick, p. 587.)

If Congress can make treasury notes a legal tender, then it can the paper of the New York banks, or Arkansas bonds, or the obligation of any private association or individual.

It is not necessary, however, to rest the case upon negative construction, for the Constitution itself specifies the power to

make paper money a tender as a distinct and separate one from either the power to emit bills or to coin money.

In section ten of Article one, the States are prohibited from the exercise of certain powers specified, some of which are expressly granted to Congress and some withheld.

Among the powers specified in that section are, the powers " to coin money," " to emit bills of credit," " *to make anything but gold and silver coin a tender in payment of debts,*" " grant letters of marque and reprisal," " enter into treaties," etc.

Of the powers specified, the Federal Executive is allowed the power to enter into treaties.

Congress is allowed the power to coin money, and to grant letters of marque, but the power to make anything but gold and silver a tender in payment of debts is carefully withheld.

It cannot be pretended that the Convention supposed this power involved in the power to coin money, because, then there would have been no necessity to specify it, and, after specifying it as a power separate from the power to coin money, it would most certainly have been enumerated among those granted, if it had been the design that Congress should ever exercise such a power. This conclusion seems inevitable. The prohibition of the States to exercise such a power was necessary, for otherwise, the States might have exercised it*;* but to authorize Congress to exercise it required an express grant, especially after the prominence given it among the powers prohibited to the States.

The Convention, having singled it out as an independent power, the exercise of which by the States was prohibited, and then, having declined to confer it upon Congress, there is no possible sophistry that can justify the latter in its exercise. It is too clear to require argument, that, where any power is enumerated in the Constitution, and not granted to Congress, it is impossible for that body to exercise it without doing violence to rules of construction universally recognized and established.

The Supreme Court of the United States, in *Craig* v. *State of Missouri*, 4 Peters, 411 and 423–4, held that " The Con-

stitution considers the emission of bills of credit and the enactment of tender laws as distinct operations, independent of each other, which may be separately performed. Both are forbidden."

Judge Story uses the same language. (Story's Const. Section 1,359.) The reason assigned is, that these powers are separately enumerated.

We have, therefore, the highest authority, that the emission of bills of credit, and the making them a legal tender, are distinct powers in the Constitution, and on the same ground *a fortiori,* the power to coin money is distinct from either and from both. The fact, also, that the States are prohibited from making anything but coin a tender, is evidence that no other Federal currency was contemplated; for if the Government can issue paper money and make it a tender, it would have been no more objectionable for the States to make the Government issues a tender than to make the Government coin a tender. The very prohibition shows that the framers of the Constitution did not contemplate any Federal currency except a metallic one, and *this* the States were not prohibited from sanctioning.

It may be well said, moreover, that the phrase " to regulate its value" contemplates action in reference to some substance, which has an *intrinsic* value, that it does not import a *creation,* but a *regulation* of a value previously existing, and independent of legislative power—the securing simply of *uniformity* in the value, and not the fabrication of the value itself. This suggestion is by no means without its force.

Upon the validity of the provision under discussion, a powerful negative argument against it is derived from this source.

The Government has existed now for nearly three quarters of a century, through periods of war, of commercial revulsions and financial derangements, but has never before claimed or exercised this power. In 1812 an emergency existed, little, if at all, inferior to the present, in which, if ever, its exercise was expedient; but Congress has never before claimed the right to substitute Government paper for gold and silver in

the business transactions of the people. In the journals of Congress we find but one instance, prior to the last year, of a proposition to make treasury notes a legal tender.

On the 12th of November, 1814, at a period of the war with Great Britain when there was most desperate need for funds, Mr. Hall, of Georgia, introduced into the House of Representatives a series of five resolutions.

The first directed an inquiry into the expediency of authorizing the Secretary of the treasury to issue —— millions of treasury notes, convenient for circulation, etc.

The second resolution was to the effect "that the treasury notes which may be issued as aforesaid shall be a legal tender in all debts due or which may hereafter become due between the citizens of the United States, or between a citizen of the United States and a citizen or subject of any foreign State or kingdom."

The third resolution provided for the purchase of as much supplies in each State and district as the amount of taxes levied therein. The fourth authorized the exchange of notes for six per cent bonds, and the fifth pledged taxes, imposts, duties, and proceeds of public lands, for the redemption of the notes. After some remarks by Mr. Hall, the question on the consideration of the resolutions was taken separately.

The House agreed to consider the first, third, fourth, and fifth resolutions, but *refused to consider* the second (the *legal tender one*) by a vote of forty-two in favor and ninety-five against.

Among the negative votes was that of Daniel Webster, then a member of the House. (Benton's Abridg. Vol. V, 361; see, also, Annals of Congress.)

This is the only recorded instance in the history of the Government of any attempt to make treasury notes a forced medium of exchange, and this is the reception which it then met with: *a refusal even to consider it, by a vote of more than two to one.*

If Congress can make paper a legal tender, it can of course prohibit the discharge of a debt by gold and silver. Suppose

52

then, Congress should enact that gold and silver should not be legal tender, and the State of California should nevertheless declare that gold and silver *should* be a legal tender, which enactment would prevail? The Federal Constitution provides that "no State shall make anything but gold and silver coin a tender in payment of debts," thereby affirming that any State may make gold and silver coin a tender. Would, then, State legislation in exact accordance with the Federal Constitution be invalid?

*Taylor & Hastings*, for Respondents.

The Constitution of the United States is to receive a reasonable interpretation of its language and powers—keeping in view the objects and purposes for which those powers were conferred.

By a reasonable interpretation is meant that in case the words of the Constitution are susceptible of two constructions—one strict, the other more enlarged—that one should be adopted which is most consonant with the apparent object and intention of its framers; that which will give *efficacy and force as a Government, rather than that which will impair its operations and reduce it to a state of imbecility.*

The Constitution being wholly unlike a municipal charter or private grant, in respect both to its means and ends, no interpretation of the words in which those powers are granted can be permitted which *narrows down their import so as to defeat those objects*, or which destroys the *spirit* and *cramps* the letter.

In interpreting a power, all the ordinary and appropriate means to exercise it are held as a part of the power itself. This proposition results from the very nature and design of a Constitution. In giving a power, it is not intended to limit it to any *one mode* of exercising it, exclusive of all others. It must be obvious, that the means of carrying into effect the objects of a power delegated *must be varied, in order that they may be adapted to the exigencies of different times.* A mode

efficacious and useful at one time, or under certain circumstances, may at another be ineffectual, or even mischievous.

Government presupposes a perpetual mutability in its own operations in behalf of its citizens; and a perpetual flexibility in adapting itself to their wants and interests, their habits, occupations, and infirmities.    This is the language of the Supreme Court in every case touching a general power.   And we ask if, tried by these rules and tested by this language, there can exist a doubt that under the general power to "coin money," Congress is authorized to make this paper the "lawful money" of the land?

It will be instructive to call to mind the very words themselves, the interpretation of which gave rise to the decisions relied on, and to the rules in them embraced.   And we distinctly state that in every instance the construction given by the Federal Judiciary to the words and phrases now to come under review is infinitely more liberal than that for which we contend.   That the words upon which the doctrine has been made to rest are far less able to support it than those which are here presented.   That the circumstances of each and every case rendered it far more laborious to reach those conclusions, and causes much greater difficulty to maintain them when arrived at, than can be experienced here.

Thus the word "*necessary*," was held not to mean "indispensable;" it was decided that it did not always import absolute and physical necessity; but that if reference was had to the common affairs of life, or to approved authors, it would be found to mean nothing more than convenient, useful, essential.   (*McCulloch* v. *Maryland*, 4 Wheaton, 413.)

"*Commerce*" is held to mean "intercourse," "navigation." "The subject to be regulated is commerce; our Constitution being, as was aptly said at the bar, one of enumeration and *not of definition*, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word." (*Gibbons* v. *Ogden*, 9 Wheat. 189; *Brown* v. *State of Maryland*, 12 Wheat. 419.)

In the Passenger Cases, the word "commerce" was extended

not only, to vessels carrying passengers, as was the case in *Gibbons* v. *Ogden,* and to the *articles* or *things* imported, as in *Brown* v. *Maryland,* but to the passengers themselves; for it was decided that the word "imports" also applied to passengers. We are aware that Mr. Webster denied the right of Congress to make a legal tender of the paper issued "on the coinage power alone." The question of legal tender is not now under consideration, but simply the power to create money out of paper. That, confessedly, is derived from the "power to coin money and regulate its value." Hereafter it will be demonstrated that whatever money can be created on the coinage power, the same can be made a legal tender.

The power of coinage granted to the United States, is much more liberal in its terms than that given to the old Confederation. As contained in the Constitution, it is: Congress shall have power to coin *money,* with a prohibition on the States from its use in any manner, save making a legal tender of gold and silver in payment of debts. In the Articles of Confederation it was: "The United States in Congress assembled, shall also have sole and exclusive power of regulating the alloy of *coin* struck by their authority, or by that of the respective *States.*" It was only a power to strike coin—the specific, not the generic term money—with the power, too, not exclusive, but shared with the individual States. Nor was there any right in the Confederation to regulate the value of foreign coin; this, also, being reserved to the States. It was such limitations, such restrictions, that caused the Confederacy to expire from mere debility. Our proposition is, that the United States can "coin *money;*" the reply is, that it can only "strike *coin.*" We claim this paper to be *money,* and it is said it is not *coin.* The framers of the Constitution well knew that the word money could not be construed to mean gold and silver only; they knew that to prohibit the States from making anything but money a tender, would be an absurdity; that instead of an inhibition, it would be an invitation to each and every State to make that a tender which to them seemed good. They undertook to limit the States to gold and silver, and have

accomplished their undertaking by exactly saying what they meant. Had they adopted the word "money," in place of the words "gold and silver coin," all know that long ere this the States would have declared the paper of the individual banks a tender in payment of debts. · Thus it is in every case; where words of limitation are required, they are expressed; where terms comprehensive and generic are needed, as in granting a great power to the Federal Government, they are used; to the end that the power "may be varied to meet the exigencies of the times, and not confined to one mode of operation exclusive of all others."

The question now to be asked is, can the money which Congress by the Constitution is authorized to coin (*create*) be made a legal tender? That Congress can make some thing, some substance, a legal tender, is admitted; we have never heard it doubted except by the counsel for appellant, when this case was argued in the Court below, and even there it was but feebly intimated, and is here silently abandoned. It would be useless to deny it. The practice of the Government throughout its entire history, proves it; and every authority that has been, or can be cited as opposed to the exercise of the power upon paper or the inferior metals, affirms the right to make gold and silver a tender in payment of debts of every kind and nature. Without doubt, therefore, this right to make tender of some material, is vested in the United States. But where? From what clause of the Constitution is this power derived? There is no grant of it in express words; nothing which declares, affirmatively, that Congress shall have power to create gold and silver, or any substane whatever, a legal tender. Why, then, does Congress possess, and from whence does it obtain this right, which confessedly exists? The answer must be—;can only be—from the power to "coin money and regulate *its* value." The coinage power, then, contains this right; it is implied, included in it. (Story on Con. Secs. 449, 1,117.) This being the case, all other questions are of easy solution. Why is gold a legal tender? It is manifest gold, as *gold*, does not answer the purpose; not gold dust, gold quartz, gold bars,

but gold converted into *money*, constitutes the legal tender of this nation; and the reason, as money it constitutes it, springs from the fact that it is "*coined* money." The same is true of silver. It is not from "the intrinsic value" these two metals possess, but because Congress can convert them, as materials, into money, that they are now, or that they ever have been, a legal tender in the United States. We affirm then, that as the power to coin money is also the power to make that money, when coined, a legal tender, *whatever substance or thing, by virtue of this power, can be converted into money, the same can be made a legal tender.* Can Congress make gold and silver a tender? Certainly, since it can coin gold and silver into money. Can Congress make a tender of copper, iron, or lead? Yes. Because they are materials which can be fashioned into money. Can paper be made a legal tender? Assuredly it can; for, "Upon the coinage power alone, it can be converted into money."

By the Court, CURREY, J.

This case involves the constitutionality of the Act of the Congress of the United States, passed on the 25th day of February, 1862, entitled "An Act to authorize the issue of United States notes and for the redemption or funding thereof, and for funding the floating debt of the United States," so far as it provides and declares that the notes to be issued by virtue thereof shall be lawful money and a legal tender in the payment of all debts, public and private, within the United States, except duties on imports and interest on the bonds and notes of the United States. If the notes issued by the authority of this Act be lawful money and a legal tender in payment of private debts, then the judgment in this action must be affirmed, otherwise it must be reversed.

With a sense that the question to be considered is one of extraordinary interest, and of paramount public importance, we have given to the subject a thorough and careful examina-

tion, and the conclusion to which we have come is the result of anxious inquiry and deliberation.

In order the better to appreciate what may follow, it is deemed appropriate to refer briefly to the character of the Government of the United States, as it existed under the Articles of the Confederation, if indeed that compact could be regarded as rising to the dignity of a Government, in the true sense of that term.

The Confederation seems to have been a league of friendship between the thirteen original States, entered into for their common defense, the security of their liberties, and for their mutual and general welfare; and by this league the States which were parties to it bound themselves to assist each other against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretense whatever. The style of the Confederacy was declared to be " The United States of America," and by the fifth of these Articles it was provided, that for the management of the interests of the United States, delegates should be annually appointed in such a manner as each State should direct, to meet in Congress. No State could be represented in Congress by less than two nor more than seven members, and in determining questions therein each State was entitled to a single vote.

To this Congress, composed of a single House of Delegates, and which was the only department of the Government, was granted a list of powers which, in appearance, placed the Confederation on an equal footing with the other civilized and enlightened nations of the world; but this was so in appearance only, for it was expressly declared by the sixth section of Article Nine that the United States, in Congress assembled, should never engage in war, nor grant letters of marque and reprisal in time of peace; nor enter into any treaty alliances; nor coin money; nor regulate the value thereof; nor ascertain the sums or expenses necessary for the defense or welfare of the United States; nor emit bills, nor borrow money on the credit of the United States; nor appropriate money; nor agree

upon the number of vessels of war to be built or purchased, or the number of land or sea forces to be raised; nor appoint a Commander-in-Chief of the army or navy, unless nine States should assent to the same; and by the second section of the First Article it was declared that each State retained its sovereignty, freedom and independence, and every power, jurisdiction and right which, by the Confederation, was not expressly delegated to the United States, in Congress assembled. The means to carry into execution the powers granted were reserved to the States; and in respect thereto, each State could act as it deemed proper; so that whatever measures Congress might devise for the common defense, for the security of the liberties of the States, or for their mutual and general welfare, were subject to be defeated, because of the utter want of all coercive authority to carry them into effect. In truth, all the power Congress possessed was the power of recommendation. It depended on the good will of the States whether a measure should be carried into effect or not. (*Federalist*, No. 15; 1 Story on Cons., Secs. 248, 253.) Hence it was that the acts of Congress were disregarded, and the Confederation, which it was intended should possess the efficient powers of a Government, was found to be destitute of the elements essential to its perpetuity.

This Confederation which, as time rolled on, was expiring from its inherent debility, was finally given over by its friends as impracticable and devoid of the faculties of a vital Government. But the necessity for a Government, composed by the union of the States, possessing the powers of a sovereign nation, was realized by the people. Without such a Government, it was known that the independence recently won could not be retained, and hence the people of the same United States, conscious from experience of the weakness and infirmities of the Confederation as a Government, did, in order to form a more perfect union than that which existed under the Articles of Confederation, and to establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare and secure the blessings of liberty to them-

selves and their posterity, ordain and establish the Constitution for the United States of America under which, for more than seventy years, the Government has grown in power and material wealth, until as a nation it has become one of the most potent of the earth.

The manifest design of the framers of the Constitution, and of the people of the States who adopted it, was to organize an efficient consolidated Government, possessing all the elements of power essential to a great nation, with capacity to perform all things necessary to accomplish and secure the ends enumerated in the preamble of the Constitution. For this purpose and to these ends, the Government was made to consist of three departments—the legislative, the executive, and judicial—and to the legislative department was committed certain powers, among which are the following:

1. To lay and collect taxes, duties, imposts and excises; to pay the debts and provide for the common defense and general welfare of the United States.

2. To borrow money on the credit of the United States.

3. To regulate commerce with foreign nations, and among the several States and with the Indian tribes.

4. To coin money, regulate the value thereof, and of foreign coin, and to provide for the punishment of counterfeiting the securities and current coin of the United States.

5. To establish post offices and post roads.

6. To declare war, grant letters of marque and reprisal.

7. To raise and support an army; to provide and maintain a navy.

8. To make rules for the government and regulation of the land and naval forces.

9. To provide for calling forth the militia to execute the laws of the Union, suppress insurrections and repel invasions.

10. And to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all powers vested by the Constitution in the Government of the United States or in any department or officer thereof.

Here is an array of powers which were granted, to be exer-

cised as occasion might demand. If the exigency requiring the exercise of any power granted to Congress exists, then Congress, as the legislative department of the Government, cannot, consistently with duty, do otherwise than exercise the power for the accomplishment of the object demanded, and for this purpose may adopt such measures as are appropriate to that end.

Congress has power to raise and support armies; to provide and maintain a navy; and to provide for calling forth the militia to execute the laws, suppress insurrections and repel invasions. But these things cannot be done merely by legislative enactments, to the effect that armies shall be raised and supported, that a navy shall be provided and maintained, or that the militia shall be called forth for the purposes designated. To accomplish these objects men and material are indispensable; and money, as a means and medium of exchange, is necessary to obtain the services of men, and the material requisite can only be provided by an expenditure of labor and money. That wars, invasions and insurrections of fearful and direful magnitude might arise was foreseen by the wise, men who framed the Constitution and by the people who adopted it, and ample powers were expressly granted to Congress to provide for every conceivable emergency requiring the exercise and exertion of governmental power and authority, for the maintenance and preservation of the United States as a sovereign and independent nation.

Though the Government of the United States is one of enumerated and limited powers, it is supreme within its sphere of action. The Constitution emanated from the people, who, in its adoption, declared and decreed that "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land, and the Judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." (*McCulloch* v. *Maryland*, 4 Wheat. 405, 406.)

The enumerated powers are general and comprehensive, and were manifestly supposed to be ample for the purposes declared in the preamble of the Constitution. But they could not be carried into execution without legislation; of this the framers of the Constitution were aware, and hence Congress was empowered to make all laws necessary and proper for carrying into execution the powers specified, and all other powers vested by the Constitution in the Government of the United States, or in any department or officer thereof.

In *McCulloch* v. *Maryland*, 4 Wheat. 407, Mr. Chief Justice Marshall said: " A Constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which it may be carried into execution, would partake of the prolixity of a political code, and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves."

In *Martin* v. *Hunter*, 1 Wheat. 326, Mr. Justice Story, in delivering the opinion of the Court, said: " The Constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution."

In the thirty-first number of the *Federalist* Mr. Hamilton said, in reference to the clause of the Constitution conferring on Congress the authority to make all laws necessary and proper for carrying into execution the express powers granted, that it was only declaratory of a truth which would have resulted by necessary and unavoidable implication from the very act of establishing the Federal Government and vesting it with certain powers; and in respect to the same clause Mr. Madison said : " Had the Constitution been silent on this head there can be no doubt all the particular powers requisite as a

means of executing the general powers would have resulted to the General Government by unavoidable implication. No axiom is more clearly established in law or in reason than that wherever the end is required the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it is included," (*Federalist*, No. 43;) and as a reason why it was inserted in the Constitution Mr. Justice Story said: " Such a clause was peculiarly useful in order to avoid any doubt which ingenuity or jealousy might raise on the subject. Much plausible reasoning might be employed by those who were hostile to the Union and in favor of State power to prejudice the people on such a subject and to embarrass the Government in all its reasonable operations. Besides, as the Confederation contained a positive clause restraining the powers of Congress to powers expressly granted, there was a fitness in declaring that that rule of interpretation should no longer prevail. The very zeal, indeed, with which the present clause has been always assailed is the highest proof of its importance and propriety. It has narrowed down the grounds of hostility to the mere interpretation of terms." (Story on the Const., Sec. 1,242; *Federalist*, No. 31.)

There can be no doubt that Congress has the power to make all laws which may be necessary and proper to the complete execution of the powers enumerated, and to which we have referred, because the Constitution itself has so declared; and the only question to be settled by the Courts is as to what laws are necessary and proper for the purpose; for it must be conceded that laws might be enacted upon the pretext that they were necessary and proper to carry into execution an enumerated power granted to Congress, which might be repugnant to the Constitution or in violation of common right, which the Courts would be bound to pronounce invalid; but " it is not on slight implication or vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void." (*Fletcher* v. *Peck*, 6 Cranch, 128.)

The question of the necessity and propriety of the Act of

the 25th of February, 1862, is involved in the consideration of this case, but it is not, with the authorities before us, of difficult solution. In fact, it may be regarded as settled in principle by the application of the rule of construction declared and vindicated in the masterly and exhaustive argument of the Chief Justice in *McCulloch* v. *Maryland,* 4 Wheat. 413, 421. In that case the clause of the Constitution which conferred the power on Congress to make all laws necessary and proper for carrying into execution the powers vested in the Government of the United States, was elaborately and ably considered, and in conclusion the Court, by its learned Chief Justice, said : " The result of the most careful and attentive consideration bestowed upon this clause is, that if it does not enlarge it cannot be construed to restrain the powers of Congress or to impair the right of the Legislature to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the Government. If no other motive for its insertion can be suggested, a sufficient one is found in the desire to remove all doubts respecting the right to legislate on that vast mass of incidental powers which must be involved in the Constitution, if that instrument be not a splendid bauble.

" We admit, as all must admit, that the powers of the Government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow the National Legislature that discretion with respect to the means by which the powers it confers are to be carried into execution which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." (See also *Gibbons* v. *Ogden,* 9 Wheat. 187, and *Ogden* v. *Saunders,* 12 Wheat. 332.)

That the necessity for raising, equipping and supporting large armies, and for providing and maintaining a navy of

unprecedented power, and for providing and furnishing the supplies and munitions indispensable to the prosecution of war, existed when the Act of Congress in question was passed, Congress determined in the affirmative; and recognizing the condition of the country, as we must, as in a state of war, engaged in the endeavor to suppress an insurrection and rebellion that was at the time and is still mighty and wicked beyond any example furnished by the history of the past, we cannot doubt the necessity of the Act now before us in judgment, or some other measure, adequate as a means to accomplish the objects of the war; nor can we doubt its propriety, provided it be within the scope of the Constitution and consistent with its letter and spirit. (Story on Const. Secs. 1,243 to 1,256.)

In *United States* v. *Fisher*, 2 Cranch, 396, Mr. Chief Justice Marshall, in reference to the clause of the Constitution under consideration, said: " In construing this clause it would be incorrect, and would produce endless difficulties, if the opinion should be maintained that no law was authorized which was not indispensably necessary to give effect to a specific power. Where various systems might be adopted for that purpose, it might be said with respect to each that it was not necessary, because the end might be attained by other means. Congress must possess the choice of means, and must be empowered to use any means which are in fact conducive to the exercise of a power granted by the Constitution."

Thus it appears, upon authority which commands our highest respect, that to Congress pertains the choice of means to carry into effect a power granted in express terms, though it must be admitted that in the adoption of means for the purpose there must be a relation, in the nature and fitness of things, between the means used and the end to be accomplished.

The power to declare war, to raise and support armies and a navy, to suppress insurrections and repel invasions, is, as already appears, expressly granted to Congress by the Constitution; and the power to pass laws for carrying these express

powers into execution is also granted in terms. Then, with respect to these express powers, the Government must be considered as supreme; and in carrying them into effect, its powers are not limited, except by constitutional provision. (Story on Const., Secs. 417 to 426, and 433, 434.)

Congress having passed the Act in question, as a means to carry into effect the power to raise and maintain an army and a navy to suppress the existing insurrection and rebellion, it devolves on those who object that the means selected are repugnant to the Constitution to point out and show wherein is the repugnancy. If the Constitution contains no provision operating in restraint of the emission of treasury notes, and making the same lawful money and a legal tender in the payment of debts, in order to make them the more efficient for the end to be attained, then upon what principle would a Court be authorized to proceed to the conclusion that the law is unconstitutional and void, in so far as these notes are made lawful money and a legal tender in the payment of debts?

The objection interposed to the binding obligation of the tender clause of the Act is sought to be maintained on the ground that the power to make treasury notes or bills of credit a tender for the payment of private debts is not conferred on Congress by the Constitution, either expressly or by implication.

It must be admitted that this power is not granted in express terms. If it exists, it is to be found in that vast mass of incidental powers involved in the Constitution, which are to be exercised by Congress when necessary and proper to carry into effect powers expressly granted. But though the Act in question be one depending for its constitutional warrant in the exercise of authority which is subordinate and ancillary to a principal and specific power, it may be equally valid as a law enacted to accomplish, in the most palpable and direct mode, an object specifically designated by the clearest constitutional expression. The Act is one relating to the *means* which Congress may adopt to attain an end; and the whole controversy is narrowed down to the constitution-

ality of the *means;* because, as we have seen, the end is legitimate and within the scope of the Constitution, and Congress has determined that a necessity existed for some measure adequate to secure the objects for which the Government was formed, and to secure which ample powers were granted in the Constitution.

The able argument of the appellant's counsel against the policy of the legislation of Congress making these treasury notes a legal tender in the payment of private debts, which he has enforced by an array of examples which should cause legislators to pause in their deliberations, would have been particularly appropriate could it have been addressed to Congress before passing the Act in question; but the evils portrayed as the consequence of making anything besides gold and silver a medium of exchange and a tender in the payment of debts would not alone authorize this Court to pronounce against the law. As an argument *ab inconvenienti*, it would have its just weight in the determination as to the validity of a law of doubtful authority, and this is the use to which, we apprehend, the learned counsel intended it should be applied.

The Constitution does not deny to Congress the authority to emit bills on the credit of the United States, nor is this power expressly conferred. If it can be exercised it must be in subordination to some specific power, when necessary and proper for carrying such power into execution. That the framers of the Constitution intended to leave the subject in the condition in which it is left, we think is manifest from the debates that transpired in the Convention in respect to it. From these debates it appears that the subject was considered and that the Convention refused to confer on Congress the power in express language to emit bills of credit. From this it seems apparent that the framers of the Constitution and the people who adopted it intended that this power should not be granted to Congress as a principal power; and as the authority was not inhibited, we think it follows that it was intended Congress might exercise the power as ancillary to the powers expressly granted, when in its wisdom it should

be deemed necessary and proper, else why was not the power to issue bills of credit forbidden to the National Government as well as to the States?

Mr. Calhoun, in his speech on the bill to establish a national bank, delivered in the House of Representatives in February, 1816, argued that, taking into view the prohibition against the States issuing bills of credit, there was a strong presumption that this power was intended to be given exclusively to Congress (Calhoun's Works, 2 Vol. 155, 156.) It is certain that from a very early period in the history of the Government the power to issue bills of credit, or, in other words, notes on the credit of the United States, has been exercised; and if legislative exposition, acquiesced in and maintained by the Courts, is ever of paramount force, it would seem that the power of Congress over this question must be considered as settled.

The next question that occurs in the discussion, after having arrived at the conclusion that Congress has the power, under circumstances of necessity, to issue treasury notes or bills of credit, is as to the power of Congress to make such notes or bills lawful money, or the equivalent of lawful money, and a legal tender in the payment of private debts.

What constitutes money, and its use as a measure of values, has ever been, among political economists, an important element in the consideration of subjects relating to material wealth. Money, in its enlarged sense, is that general medium of exchange by reference to which the value of other things is estimated, and is the representative and equivalent of such value. Those who desire, may learn from history that since society had its first existence many different commodities have been used as a circulating medium or medium of exchange. Some of these were most inconvenient and ill adapted to the purposes of exchange, but seem to have been adopted for want of something better. The precious, as well as the base metals, were used in some countries at an early date, though in others, at a comparatively modern period, other substances were employed as the currency, by which exchanges were effected.

54

Shekels of silver were current money in the time of Abraham. The Spartans adopted iron; the ancient Romans copper; the Russians, at one time, platinum; the North American Indians used wampum, with which the Puritans, at one time, effected their own exchanges. To this enumeration might be added others, and also instances of the use of the products of labor as a medium of exchange or money. The writers on political economy generally agree that whatever comes to be used as the common equivalent for other things, and the standard by which their values are measured, be the commodity whatever it may be, is money. (McCullough's Political Economy, Ch. 4; John Stuart Mill's Political Economy, Book 3, Ch. 7; Bowen's Political Economy, Ch. 18; Rees' Cyclopedia.)

In all ages of the world, and in nearly all countries, metals seem to have been used, as if by common consent, to serve the purposes of money; other articles have been and still are used as money, such as paper in highly civilized countries, and *cowrie* shells and like articles of insignificant intrinsic value among barbarous nations. Metals, in all times of which we have any historical knowledge, were esteemed of value for practical uses, and were employed in commerce, probably not so much as a general standard of the value of other things as an article which facilitated exchange by barter. In the earliest annals of commerce metals are spoken of as objects of value; and it may safely be assumed that metallic money was selected as a medium of exchange because its value was less fluctuating than that of most other substances. Especially, says Mr. Mill, was gold and silver fixed upon by the tacit concurrence of almost all nations to serve this purpose, for the reason that no other substances unite the necessary qualities in so great a degree with so many subordinate advantages. The contrivance of fabricating gold and silver into coins, by which the weight and value of each coin was ascertained and indicated by its face, is of remote antiquity. And in order to secure the advantages of uniformity and public confidence in the currency, Governments in modern times have usually exercised the exclusive right to coin money and regulate its value. By the

Constitution of the United States this right was conferred on Congress as a principal power.   Without a means of this kind to ascertain the value of coin, it would be difficult if not impossible to determine the sufficiency of tenders made for the discharge of pecuniary obligations.

Gold and silver fashioned into coins are not exempt from the laws which govern the prices of other commodities, though generally they have been less subject to fluctuations in value than almost any other articles of production, for the reason that their production has not, except perhaps in two instances of modern times, exceeded their ordinary demand.   The instances referred to stand connected with the discovery of the mines of Spanish America, in the sixteenth century, and the more recent and transpiring discoveries of the precious metals in Australia and upon the Pacific slope of the United States of America.   In the course of a century and a half immediately following the discovery of the Spanish American mines, the depression in the value of gold and silver was as three to one; and we who live at this day have not failed to observe the great and permanent increase in the price of commodities within the last fifteen years, consequent upon the increased production within this time of the precious metals; so that, though moulded into coins and impressed with the stamp of the mint, they retain all their properties as articles of commerce, and are a measure of the value of other things in the same manner as the latter are a measure of the value of gold and silver.

Mr. Mill says: " The relations of commodities to one another remain unaltered by money; the only new relation introduced is their relation to money itself; how much or how little money they will exchange for—in other words, how the exchange value of money is determined.   And this is a question not of any difficulty, when the illusion is dispelled which caused money to be looked upon as a peculiar thing not governed by the same law as other things.   Money is a commodity, and its value is to be determined with that of other

commodities, temporarily by demand and supply, permanently and on the average by cost of production."

Professor Colton, in treating of the subject of paper money, and banking, says that gold and silver, used as money are a mere credit currency, representing all the values arising from the great variety of their uses, and their credit is based upon these values, their value as money being but a fraction of the whole, itself borrowed from these other values. (Public Economy, Ch. 16.)

Both gold and silver, as to their value, are alike subject to the laws of change consequent upon the extent of their demand and production, and are therefore imperfect standards of value. Affected by the same law or principle, each of these metals is subject to change in its own value, and in relation to the value of the other, and also to that of other commodities; and hence it is that the inequalities in the relations of value between these two metals have been sought to be adjusted by Governments, as the exigencies of change required, by altering the quality or weight of the coin without changing its denomination.

In the time of and prior to the reign of Henry III of England, silver was the universal medium of exchange in that country, and it was not until the time of Edward III that gold, as well as silver money, became a legal tender; and from that period until the year 1774, both these kinds of money were recognized by law as authorized standards of value, in all payments whatever, when it was provided by statute (14 George III, c. 42) that thereafter silver coins should not be a legal tender in payment of any sum exceeding twenty-five pounds, except according to their value in weight, at a specified valuation per ounce. In 1816 the legal tender of silver coins was still further restricted to payments not exceeding forty shillings. (1 Blackstone Com. 277.)

A writer, whose name we have been unable to learn, in an able article on the subject of money, argues that, as a matter of convenience, " the metal of which the chief medium of exchange is fabricated should have reference to the wealth and

commerce of the country for which it is intended ; that copper or silver coins of the lowest denominations suffice for the convenience of a very poor country ; but that as a country advances in wealth its commercial transactions are more costly and require coins of corresponding value." (Standard Library Cyclopedia, Vol. 3, page 351.) This writer maintains that a large circulation of coins is the most extravagant mode of furnishing a people with a medium of exchange, because of accidents and contingencies by which they are irretrievably lost or destroyed, thus diminishing the wealth of the country and wasting the products of labor ; and he then says "some cheaper kind of money therefore should, as far as possible, be used as a substitute for gold and silver—and such a substitute has been found in paper ;" which he argues is not only more economical than gold or silver, but is more convenient than either for effecting large payments or for transmitting large sums to a distance ; and that in this respect it excels gold more than gold excels silver.

Mr. Ricardo, in his work on political economy, at page 507, expresses the opinion that money, in its most perfect state, is paper money ; and Adam Smith said : " The substitution of paper in the room of gold and silver money replaces a very expensive instrument of commerce with one much less costly and sometimes equally convenient." (Wealth of Nations, Vol. 1, page 447.) Professor Colton argues that money, in all its forms and substances, is a credit currency, and derives its credit from considerations extraneous to itself; and that the invention of paper money was, in the march of civilization, as much an improvement on metallic currency, in its adaptation to the necessities of the commercial world, as metallic money was an improvement on the system of barter.

Thus much has been said respecting metallic and paper money for the purpose of furnishing a general idea of the causes which induced and necessitated the use of these substances as a medium for effecting exchanges, and particularly with the object of dispelling the illusion which, having become inveterate from misleading associations, has caused the precious metals

to be esteemed as the only substances of which money can be made, and as the only legitimate currency for the uses of commercial exchanges.

Money is, as we have before observed, in a general and enlarged sense, a medium of exchange, by which the value of other things is estimated, and is the representative and equivalent of such value, and in the sense of the term as thus defined we must understand the words "lawful money," as used in the Act of Congress under consideration.

The principal objection on the part of the appellant is that Congress had not the power under the Constitution to make the notes issued in pursuance of the provisions of the Act in question a legal tender in the payment of private debts. If Congress has the power to make gold and silver coined at the Mint a legal tender in the payment of debts, upon what argument can the objection to the making of treasury notes issued on the credit of the United States a like tender, be maintained? It may, perhaps, be answered that the power to coin money is granted, and that coining money means the fabricating of metals into coins, and that therefore nothing except coined metals can be made a legal tender in the discharge of pecuniary obligations. Were it admitted that the power "to coin money" is limited to a coinage of metals, it would not result from this that no other kind of money could be made a legal tender, unless it were first conceded that Congress had no power to adopt means for the execution of a designated power except the means were specified. Such a concession, however, has never been made by the judiciary, nor by any enlightened statesman, however narrow have been his views of constitutional power. We do not maintain, nor do we believe, that Congress possesses any powers not granted in the Constitution, but it cannot be conceded that no powers are granted except those expressed in terms. The powers to levy and collect taxes, to pay the debts and provide for the common defense and welfare of the United States, to borrow money, to regulate commerce, to coin money, to establish post offices and post roads, to raise and support an army and to provide and maintain

a navy, involve in their execution the means for the accomplishment of the objects proposed; and those who framed the organic law of the nation, many of whom were profound jurists, recognized as axiomatic truth that whenever a general power to do a thing is given the means necessary to its execution results as an incident of the power.

The truth that the United States of America was constituted by the people a consolidated Government, sovereign and supreme within the scope of the powers specified, should ever be kept in view when estimating the measure of its capacity and power. In *Cohens* v. *Virginia*, 6 Wheat. 414, Chief Justice Marshall said: "America has chosen to be, in many respects and to many purposes, a nation; and for all these purposes her Government is complete; to all these objects it is competent. The people have declared that in the exercise of all powers given for these objects, it is supreme. It can, then, in effecting these objects, legitimately control all individuals or Governments within the American territory." In the same case this venerated Judge, who never failed, when the occasion for an opinion demanded a construction of the powers of the Government as a nation, to show how utterly fallacious and destructive of nationality was the doctrine of a narrow and illiberal construction of the Constitution, said: "A Constitution is framed for ages to come, and is designed to approach immortality as near as mortality can approach it. Its course cannot always be tranquil; it is exposed to storms and tempests, and its framers must be unwise statesmen indeed if they have not provided it, as far as its nature will permit, with the means of self-preservation from the perils it is sure to encounter." (6 Wheat. 387.) And in the course of his exhaustive argument in the same case he further said: "We think that in a Government acknowledged supreme, with respect to objects of vital interest to the nation, there is nothing inconsistent with sound reason, nothing incompatible with the nature of Government, in making all its departments supreme in so far as is necessary to their attainment." (Id. 415.) "The sword and the purse," he said in *McCulloch* v.

*Maryland,* " and all the external relations, and no inconsider-
able portion of the industry of the nation, are intrusted to its
Government.   It can never be pretended that these vast pow-
ers draw after them others of inferior importance merely
because they are inferior.   Such an idea can never be ad-
vanced.   But it may be, with great reason, contended that a
Government intrusted with such ample powers, on the due
execution of which the happiness and prosperity of the nation
depend, must also be intrusted with ample means for their
execution."   (4 Wheat. 407.)

To declare war and to suppress insurrections and repel inva-
sions are sovereign powers in a Government, necessary for its
defense, perpetuity and the general welfare.   It must be
intended that those who organized the Government of the
United States were well aware that the republic, which had
its origin in their day, would be exposed to perils from with-
out and also to dangers from within, and hence the power was
granted to declare war as the exigencies for war might arise ;
as also the power to repel invasions, to suppress insurrections
and to punish treason, that thereby the general welfare might
be promoted, and the blessings of liberty secured for them-
selves and their posterity, who, through succeeding genera-
tions, should possess the land for ages to come.

The power to declare war, suppress insurrections and repel
invasions is paramount among the specifically enumerated
powers granted to Congress, to which all other express powers
stand in auxiliary relation.   Among these is the power to
raise and support an army, and to provide and maintain a
navy ; and directly to this end every able-bodied citizen may
be compelled, as exigencies require, by pains and penalties
involving his liberty and life, to leave the peaceful avocations
of his home to meet in arms the enemies of his country ; and
to the same end all material and munitions necessary to the
successful prosecution of war may be appropriated if need be.
Fortifications may be constructed, and ships for the navy may
be built and equipped, at the cost of labor and money ; and
to accomplish these and like objects, all of which are auxiliary

to the ultimate ends of war, money may be borrowed on the credit of the nation, to repay which the faith of the Government, together with its property and that of its citizens will stand pledged; also taxes, duties, imposts and excises may be laid and collected, by which the citizen may be drained of his last dollar. To the same end the power to regulate commerce may be exerted to the extent of enforcing embargoes and non-intercourse with nations unfriendly to the cause of the Government. Upon this topic illustrations might be multiplied, but those given seem to us ample for all who are willing to know the truth and to be conducted to the gaol to which truth ever leads its votaries.

Without the power to defend against invasions and to suppress insurrections and rebellions, our Government would rise to a degree of importance no greater than a "splendid bauble." But happily for the people who organized it and their posterity, its powers were and are sufficiently comprehensive to constitute the union of the States a consolidated Government and a sovereign within the scope and measure of the powers granted, which powers not only comprehend those specified in terms, but also all incidental powers, necessary and proper for carrying into execution the powers particularized. (Story on Const. sections 430–435.)

As we view the question, it is not necessary to seek for the power to make the treasury notes issued under the Act of Congress of the 25th of February, 1862, a legal tender in the payment of debts alone among the powers to borrow money, to regulate commerce and to coin money, though we do not say it may not be deduced from some one of these; but we think it appropriately belongs to the power which Congress has over the subject as a *means,* ancillary to the accomplishment of the legitimate object for which they were really issued, and that the Act of Congress upon this particular point was an exercise of sovereign authority within the scope of the powers granted in the Constitution.

The general conclusion to which we have been conducted has been reached by the Court of Appeals of New York, in

55

*Meyer* v. *Roosevelt*, and other cases, in able opinions maintaining the power of Congress under the Constitution to make United States notes lawful money in the sense herein indicated and a legal tender in the payment of debts; and though we have traced this power to its authoritative sources by a somewhat different course of reasoning from that pursued by the New York Court of Appeals, the great fundamental principles upon which that Court and this place the decision of the question are the same. We may also refer to the case of the *Bank of Commerce* against *New York City*, decided by the Supreme Court of the United States, involving the principle of the supremacy of the national authority, exempting the bonds and notes issued under the Act of Congress of February 25, 1862, from taxation by or under State authority as maintaining in some degree, at least, the doctrines which we have upon reason and authority sought to support. (2 Black's R. 620.)

This law having emanated from the sovereign authority, by which the notes issued in pursuance of its provisions are made lawful money and a legal tender in the payment of debts, is the supreme law of the land, and is with us the rule of judgment.

Therefore the judgment must be and is hereby affirmed.