Milliken *et al.* *v.* Sloat.

1    573
1    585
1    607
1    612
1    613
2    105
2    166
4    463
4    465
4    468

---

# T. J. MILLIKEN et. al., Respondents, *v.* C. O. SLOAT, Appellant.

The Act of the Legislature of the State of Nevada commonly called the "Specific Contract Act," is prospective and not retroactive in its operation. (Per Brosnan.)

Said Act is in conflict with an Act of Congress, and therefore void.

Constitutionality of the Act of Congress making United States Treasury Notes a legal tender reaffirmed.

The law of Congress approved March 3, 1863, indirectly licensing contracts for the sale of gold, refers to these gold contracts which are not in form technical debts, and must be enforced by action of covenant or assumpsit, with an assessment and judgment for damages.

The licensing such contracts does not repeal or modify the law of Congress making United States notes a legal tender for all debts except duties, imposts and interest on the public debt.

APPEAL from the District Court of the First Judicial District, State of Nevada, Storey County, Hon. RICHARD RISING presiding.

*Wm. G. Murphy, David E. Bailey, Charles E. DeLong, J. Neely Johnson* and *Hal. Clayton,* for Appellant.

*Crittenden & Sunderland, Hillyer & Whitman, Tod Robinson, J. Seely, Thos. Wells, Thos. H. Williams* and the Attorney General, *G. A. Nourse,* for Respondents.

*Murphy & Bailey* filed the following points and authorities in behalf of Appellant:

The Court had no power to render a judgment for gold coin as decided by this Court in *Maynard* v. *Newman* and *Burling* v. *Goodman.*

The Act of Congress being supreme, the State law, which is in direct conflict, must be null and void. (Const. United States, 2d clause of Art. VI.) This case must be governed by the decisions of this Court above referred to.

When Congress has acted on a certain subject within the scope of their authority, a State Legislature cannot legislate on the same subject even in aid, much less in opposition, to the Congressional enactment. (*Prigg* v. *The Commonwealth of Pennsylvania,* 16 Peters, 417.)

Legislative Acts are never retrospective, unless made so by clear and express language.

When this debt fell due it might have been discharged in legal tender notes, as this Court has decided. No State law could be passed binding a party to pay more or pay differently from the manner he was bound to pay when the money fell due. (*Ogden* v. *Sanders,* 12 Wheaton, 286.)

The judgment does not follow the contract, the contract being alternative to pay gold or to pay legal tender notes on a certain basis, and is therefore erroneous. (*Stockton* v. *Scobie,* 1 J. J. Marshall, 6.)

The Court erred in refusing to order satisfaction of judgment when the full amount thereof was tendered in legal tender notes.

*Thomas H. Williams,* for Respondents, filed the following points and authorities:

In the construction of statutes, the primary object is to ascertain the intention of the Legislature. (Sedgwick on Stat. and Const. Law, pp. 229-30-31; Smith on Stat. and Const. Law, p. 290.)

Statutes similar to ours have been held to apply to past transactions. (Sedgwick, 199, 200-1, 410-11-12; 17 Barbour, 358; 1 Kernan, 281; *Bear River* v. *Higgins,* 27 Cal. 153; 27 New York; *Valentine* v. *Center,* 28 Cal.)

Adopting the Act of another State, the interpretation of that Act by the Courts of the State from which it is taken is also adopted. (Smith, 479; *Pico* v. *Coleman,* 4 Cal.)

The "Specific Contract Act" of this State was taken from

California after it had been construed in that State. (*Galland* v. *Lewis*, 24 Cal. 46.)

The section in lieu of which this was enacted has been repealed.    (6 Cal. 383.)

*Tod Robinson*, for Respondents, filed a brief urging the proposition that the Act of the State Legislature is not in conflict with the Act of Congress, and therefore void and inoperative.

Courts always enforce contracts which are not immoral, contrary to public policy, nor inhibited by positive enactment.

To refuse to enforce this contract is, in effect, to hold that contracts for gold are illegal.

Gold and legal tender notes are by law put on the same footing.  If a contract for payment in gold is illegal and void, then a contract for payment in legal tender notes is equally so.   The law makes no distinction between the two kinds of money—both are a legal tender.   But does it follow that parties to a contract are prohibited from making a distinction? The law makes no distinction between ten dollar pieces and twenty dollar pieces of gold as a legal tender, yet we know of no reason why one party might not make a contract to have his debt paid in ten dollar pieces, whilst another should contract that his should only be paid in twenty dollar pieces. Neither contract would be illegal nor contrary to the policy of the law.

These views were impressed by a train of argument and illustration too long to be inserted in this report.

The Attorney General, *Nourse*, filed a written brief, averring, first, that the law of Congress making the United States notes a legal tender was unconstitutional.  Second—That even if that Act was not unconstitutional, the State law was not in conflict with the Act of Congress.   That the Act of Congress gave to debtors the privilege of paying in either coin or paper. That debtors might, by contract, waive such privilege, and the State might give the Courts power to enforce contracts in which that privilege was waived.

The case, after having been once decided, was opened for reargument.

The original opinion was delivered by Justice BROSNAN, Justice BEATTY concurring.

The opinion of the rehearing was delivered by Justice BEATTY, Justice BROSNAN concurring.

The Chief Justice dissented from both opinions.

Opinion by BROSNAN, J., BEATTY, J., concurring, LEWIS, C. J., dissenting.

On the 15th day of April, 1864, the appellant executed and delivered to one Finne his promissory note, payable in gold coin on the 15th day of October following. This note was assigned to the respondents, the plaintiffs below. On the 30th day of January, 1865, more than three months after maturity of the note, suit was brought thereon, a demurrer was interposed and overruled; and a final judgment, no answer having been interposed, was rendered in favor of the plaintiffs on the 17th day of February, 1865.

The judgment demanded payment and satisfaction in United States gold coin.

Execution was issued, whereupon the defendant (appellant) tendered the full amount of the judgment and costs in legal tender notes, commonly called " greenbacks," and moved the District Court to order satisfaction of the judgment entered of record. This motion was denied, and the appeal in this case is taken from the order and from the judgment. Two objections are prominently presented :

*First*—The appellant contends that the Act of the Legislature of this State, passed January 4, 1865, commonly styled the " Specific Contract Act," is prospective and not retroactive in its operation.

*Second*—That if the Act be retrospective, it is void because it conflicts with the Act of Congress passed February 25, 1862, which declares that the notes of the United States are a legal tender for the payment of debts, etc.

In our opinion both objections are tenable.

1st. Is this Act of January 4, 1865, retroactive in fact? Does it by express terms, or unavoidable implication, so clearly

embrace contracts antecedent to its enactment as not to admit of a different construction?

Retrospective laws have been regarded from remote anti-quity as odious and tyranical, and they have been almost uni-formly discountenanced by the Courts of Great Britain and the United States. Bracton, in discussing the subject, adopts the maxim of the civil law in these words : " *Nova constitutio futuris forman debit imponere non præteritis.*"

Lord Bacon, in his quaint style, says : " It is in general true that no statute is to have a retrospect beyond the time of its commencement." The French code provides expressly that no law can have a retrospective effect. " All laws," says Black-stone, " should be made to commence *in futuro ;*" and the Constitution of New Hampshire declares " retrospective laws to be highly injurious, oppressive and unjust." Thus we find that the power of the Legislature to enact retrospective laws has been stubbornly denied by many able writers.

Sedgwick, in treating of the subject, makes use of the fol-lowing emphatic language :

" Nothing short of some great paramount emergency of pub-lic policy can justify laws of this kind, and it will be well for all engaged in the business of government to understand and remember that the steady and uniform rule should be to make statutes operate prospectively only. No exception should be tolerated but on the ground of a controlling public necessity." (Sedgwick on Stat. and Con. Law, p. 202.)

The foregoing suggestions have been advanced with a view to admonish at least against a loose and latitudinarian construc-tion of a species of legislation objectionable and inaccordant with the fundamental principles of the social compact.

We would not be understood, however, as alleging that retrospective legislation is not within the scope of the law-making power.

The settled and approved doctrine at this day is, that such power exists outside of an express and positive constitutional inhibition in certain enumerated cases (as for instance, laws of a criminal nature, or laws impairing the obligation of con-tracts, which are positively inhibited), and that the only check upon this power seems to be, that the Courts will not give a

37

retrospective interpretation to statutes unless the intention of the law-makers is so plain, either by express words, or by unavoidable implication, as not to fairly admit of the opposite construction. To state the proposition with all the clearness we can command, and to avoid misapprehension, our understanding of the law on this subject as now settled is, that the primary rule of construction is to give a statute a prospective effect, but that the rule must yield if the retroactive intention is so plainly expressed or manifest as to leave no doubt upon the mind. And this is confined to cases where no constitutional objection interposes, as before stated.

We will instance some cases wherein laws, though confessedly retrospective, have been held by the judiciary to be unobjectionable. Such are statutes declaring valid acts of officers illegally elected or appointed; confirming the acts of towns and corporations, municipal or otherwise; correcting and ratifying assessments irregularly made; extending the time for the collection of taxes, and confirming the informal levying of the same, and altering and amending the modes of procedure in judicial matters.

In these and other such instances the laws clearly retroact, and *individuals* may sometimes suffer thereby, but such laws are supported solely upon the principle that the interests of the public are involved and deemed paramount to those of individuals, a principle which cannot, we apprehend, be invoked in favor of the respondent in the case at bar.

In support of the doctrine that, in order to give the statute a retroactive effect, the law itself must so state in express terms, or such intention must be otherwise clearly manifest; we will refer to authorities. When imprisonment for debt prevailed in the State of New York, if a person incarcerated for that cause merely stepped beyond the jail liberties, it was held to be an escape, and a right of action instantly accrued therefor against the Sheriff, and a return or recapture before suit brought was no defense to the action. To remedy this harsh rule the Legislature passed an Act declaring that a return or recapture before suit should be a good defense. An action was instituted against a Sheriff for an escape. During the pending of this action the above mentioned statute was passed, and on the

trial it was contended that the Sheriff was entitled to its bene-
fits (a recapture having been pleaded), on the ground that the
statute operated retrospectively.   There were no express words
to denote a retroactive intention.

The Court held it did not so act, and Thompson, J., in his
opinion said :   " It may in general be truly observed of retro-
spective laws of every description, that they neither accord
with sound legislation nor the fundamental principles of the
social compact.   How unjust, then, the imputation against
the Legislature that they intend a law of that description
unless the most clear and unequivocal expressions are adopted."
(*Dash* v. *Van Vleeck*, 7 J. R. 477.)   Indeed the authorities
uniformly speak the same language.   ( *Vide Bailey* v. *Mayor*,
etc., 7 Hill, 147; *People* v. *Carval*, 2 Seld. 463 ; *Palmer* v.
*Conley*, 4 Denio, 376.)   There is no need of multiplying
authorities to this point.

We are of the opinion that when a statute is silent as to
past time and events, Courts are bound to apply it only pros-
pectively.   (*Jarvis* v. *Jarvis*, 3 Ew. Ch. 462; *Palmer* v. *Con-
ley*, 4 Denio, 376.)

It may be further observed as a general rule, that a statute
affecting rights and liabilities, should not be so construed as
to act upon those already existing.   To give it that effect the
statute should in express terms declare such to be the inten-
tion.   (*Johnson* v. *Burrell*, 2 Hill, 238.)

Now at the time the note in this case was made and matured,
the defendant had a legal right to pay the amount stipulated
in legal tender notes.   That was the law; it entered into and
was a part of the contract.   Without determining, however,
at this time, whether this was such a " vested right " as the
Legislature had not the power to overthow, it was certainly
such as ought not to be presumed defeated by their action,
inasmuch as they have not declared that intention by express
retrospective terms.

Laws of this character partake of the mischiefs of *ex post
facto* laws; and when they affect contracts or property, would
be equally unjust as *ex post facto* laws when applied to crimes.

We have not overlooked the case upon which the respondent
so confidently relies, viz: that of *Galland* v. *Lewis*, decided

in the Supreme Court of California, in which the same question presented here was decided. That Court holds that the California statute, which is precisely like ours, is retrospective and embraces antecedent contracts. While we have the highest respect for the learning and ability of the Judges who at present grace the bench of our sister State, we are compelled to say that we *are not* satisfied with the reasoning or authority marshaled in support of that decision.

In the first place, *Galland* v. *Lewis* does not discuss or decide whether the law was retroactive or only prospective in effect. The learned Judge *assumes* it to be retroactive, and thence, by a very natural process, argues that it is *valid*, for the reason that it is not in conflict with any vested right, secured by constitutional guarantee or protected by the principles of universal justice. But the law may be valid, though not necessarily retrospective, so as to embrace and apply to antecedent contracts.

Then the authorities invoked by the Court are lamentably out of point.

The Kentucky case (*Cole* v. *Ross*, 9 B. Monroe, 393), was an action upon a covenant to deliver good merchantable pig metal, at twenty-nine dollars per ton, to a stipulated amount; when the commodity, by the terms of the contract, was to be delivered, the metal had advanced considerably in price. The defendant tendered the stipulated amount at the rate of twenty-nine dollars per ton, when it was worth much more. The Court held it was " a contract for pig metal and not for money."

Of course, a tender of the amount at the stipulated price of twenty-nine dollars per ton, when its value had been greatly enhanced by the time the contract was to be discharged, would not meet the terms of the obligation. In such cases the doctrine is settled, that the measure of damages is the value of the property at the time of the breach, and that amount not having been tendered, the defendant's liability still existed. We find no fault with this doctrine, but fail to discover any analogy between that and the case under consideration. The case from Indiana we think less germain to the question, if possible.

We have, therefore, come to the conclusion that the Act of

the Legislature, approved January 4, 1865, does not embrace contracts entered into before it went into effect, and is prospective only in its operations.

2d. We proceed to the consideration of the second question. Does the Act of the Legislature passed January 4, 1865, conflict with the legislation of Congress which declares the issues of the United States notes to be a legal tender, at their face, in payment of debts?

The first Act giving the character of legal tender to these notes is that of February 25, 1862. Subsequent statutes contain the same phraseology on this subject. After declaring them payable in all transactions to and from the Government, except customs, dues and interest on the public debt, the Act provides " and shall also be lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid." (12 Statutes at Large, 345.)

In the case of *Maynard* v. *Newman*, this Court adjudged the constitutionality and validity of this law. Being valid, it is supreme. The Constitution of the United States so declares in express and positive terms. " This Constitution, and the laws of the United States which shall be made in pursuance thereof, etc., shall be the supreme law of the land, and the Judges of every State shall be bound thereby, and anything in the Constitution or laws of any State to the contrary notwithstanding." (Const. U. S., Art. VI., Sec. 2.)

Having held the Act of Congress valid, we cannot fail to perceive a repugnancy between it and the Act of the Legislature, and consequently the latter must yield. The one applies to all debts, public and private (other than those specifically excepted), and provides that they may be paid and discharged by legal tender notes. The State law embraces debts, not within the excepted cases; and in effect aims at engrafting other exceptions upon the Act of Congress. It is making the Act to read : except duties on imports, interest on public debt *and* a class of debts *payable in gold coin.* This will not answer. If the Legislature has the power to make this exception, it can make other exceptions and thereby emasculate the law of Congress so as to render it practically ineffectual.

The demand for which this action was instituted is a *debt*, as designated in the Act of Congress, liable to be liquidated and canceled by payment of legal tender notes at their face value. It makes no difference in the eye of the law that the contract calls for payment in gold coin, the legal character of the demand, and the force and effect of the law of Congress still remains impressed upon it. Can a State law withdraw it from the operation of the paramount law? It is a debt, which in virtue of the express mandate of the supreme law may be paid in those issues which that law itself called into existence.

But it is said this statute is merely remedial, and that the remedy is strictly just and equitable.

Admitting all this, and conceding, as we do, that every principle of honor and honesty demands that the debtor should discharge his engagements to the letter, still the position we take remains unaffected. As between the parties, it would be strictly equitable and just to compel the performance of the contract according to its express terms, but in the teeth of the legislation of Congress the Court has not the power, and we cannot exercise jurisdiction in the domain of ethics, however ignominiously a debtor may act in refusing to observe a sacred regard for his obligations. The stubborn ever-recurring question is, does this Act conflict with the law of Congress? If it does, no matter how remedial or equitable it may be, it is void and must disappear before the majesty of the higher law. Was the debt in question within the provisions of the Act of Congress? Yes. Was it of either class exempted by the terms of that Act? Clearly not. By what power or authority, then, can the Legislature of a State exempt or disenthral it from the embrace and operation of the national edict? This Act is in derogation of the Act of Congress. All such laws stand in direct and brazen antagonism to the policy of the nation, and, practically extended through several States, during the rayless period of the nation's travail, would have inflicted a wound upon constitutional liberty which the coming ages would not see healed. Such laws in the face of the action of the Congress of the United States, asserts that most abused, because illy understood, doctrine of State rights in its most odious and intolerant aspect.

We are told that two kinds of currency exist, and that both are different in intrinsic value. Granted as a fact; yet in the eye and judgment of the law, for the purpose of discharging debts not excepted in the Act of Congress, they are identical, rather equivalent.

By positive law a legal equality is established between the metallic coinage and the paper currency of the Government, and I hold that *judicial* inquiry is not admissible to make any distinction between them, where the debt or obligation is expressed in Federal money or currency. Casuists may attempt to discriminate, but their logic will limp and halt.

Government has the power to reduce the weight or debase the fineness of its metallic currency, yet debts contracted, while the standard of weight is say one hundred grains to the dollar, may be discharged by the new coin, though decreased in intrinsic value to a standard below one hundred; we presume this will not be denied. Indeed such fact is part of the history of our Government. Yet we have heard no complaints on that ground. We have not read of any objection to the exercise of the power.

The first silver dollars coined in 1794 weighed each four hundred and sixteen grains; in 1837 the standard weight of the silver dollar was reduced to four hundred and twelve and a half grains.

In 1834 the weight of fine gold to the dollar was reduced, and in 1837 the standard of weight was insignificantly advanced to the point at which, we think, it now stands, namely, a nominal fraction over twenty-three grains.

Take an illustration. A borrows from B one thousand dollars in gold, and agrees to pay it in one year, gold coin alone being current, legal tender, the standard weight of the gold dollar at the time of the contract being fixed by law at twenty-five grains, but before the day of payment, Congress by law reduces the standard weight of the dollar to twenty grains, but making it a legal tender, cannot the debtor discharge the debt with the new coin, although of less intrinsic value than the coin he had of his creditor? We hold that he can; because the creditor is bound to receive the public currency, and bound to receive it at its *legal* value. *Ita lex scripta est.* (1 Bouv. L. D. 358.)

On principle, do the creditor's rights or conditions stand upon a different footing, when the same sovereign power which made the dollar of diminished intrinsic value an equivalent in law for the other of greater intrinsic value has declared that its notes of issue shall have the like effect ? We think not.

In this there is nothing startling. It is incidental to the mutations natural in governmental as in commercial affairs. And as debts that may have been contracted while gold and silver were the only legal tender (this debt was not of that kind) may now be discharged in United States notes, so debts incurred during the present state and condition of monetary affairs, though contracted upon a paper basis and calculation, will be paid in gold and silver when the metallic currency shall again become the sole legal tender—a period, we are happy to believe, fast approaching.

We have reached the following conclusion in this case, after much sincere and anxious deliberation : The question discussed in the last point is new, and we had consequently to rely upon our own reflection and judgment, unaided by light from adjudicated cases. It is indeed true that the Supreme Court of California, in *Carpentier* v. *Atherton*, 25 Cal. 565, have held a doctrine different from that we here maintain.

It is not from disinclination that we fail to approve the opinion of that learned Court upon so grave a question as the one involved, but a sense of duty and responsibility to our convictions of what we believe the law really is, forces us to a conclusion opposite to that declared by that able and highly respectable tribunal.

Our opinion is that the Act of January 4, 1865, is in conflict with the law of Congress to which we have referred, and that it is therefore void.

The judgment and the order appealed from must be reversed so far as it demands payment in gold coin, and the Court below is directed to enter satisfaction of the judgment upon payment by the appellant, in any legal tender recognized by the laws of the United States, the full amount of the judgment and costs.

The costs of this appeal will be paid by the respondents.

It is accordingly so ordered.

## OPINION ON REHEARING.

Opinion by BEATTY, J., BROSNAN, J., concurring.

In this case a rehearing was granted not so much because the majority of the Court, who concurred in the original opinion, had any doubt about its correctness, but for the reason that it involved not only the interests of the immediate parties to that suit, but also large interests which were not represented before this Court when the case was decided.

In the argument upon rehearing the counsel for respondents not only argued the question as to the legality of the Act of the Legislature of this State which was in controversy, but went into an elaborate argument of the constitutionality of the Act of Congress, making United States notes a legal tender.

The latter question was carefully considered by this Court in the case of *Maynard* v. *Newman*, and we came to the unanimous conclusion that the Act was constitutional.

We heard nothing in the reargument of this case calculated in the slightest degree to raise a doubt in our minds as to the correctness of our conclusions in that case. We abide by that decision and have nothing to alter or amend therein.

We think that decision fully sustained by the unanimous opinion of the Supreme Court of the United States in the case of *McCulloch* v. *The State of Maryland*.

The constitutionality of the very Act under consideration has been sustained by the Courts of highest resort in New York, California, and, we believe, four or five other States, though we have before us only the decisions of New York and California on this subject. (See 27 New York R., *Metropolitan Bank et al.* v. *Van Dyck*, p. 400; *Lick* v. *Faulkner*, 25 Cal. 404.)

We learn from newspaper report that the Court of Appeal of the State of Kentucky has held the Act to be unconstitutional.

There is then an overwhelming weight of judicial authority sustaining the constitutionality of the law.

On the other side we have not been referred to one single judicial opinion (even the Kentucky decision was not referred

to), but we have had quoted a number of political speeches made in Congress, some whilst this law was under consideration, others when totally different matters were being discussed.

The opinions of great men are entitled to some consideration at all times. But those who are familiar with the history of this country and know how often our great men have changed their views about the constitutional powers of Congress, will not be disposed to give great weight to opinions about such matters expressed in political debates. Perhaps the absurdity of giving weight to such opinions could not be better shown than by simply mentioning the fact that the respondents quote Daniel Webster as authority for the strict construction doctrines advocated by them, whilst the appellant quotes John C. Calhoun as authority for the doctrine that Government may issue bills of credit.

Of all our distinguished public men, John C. Calhoun and Thomas Jefferson carried their State rights views to the most extreme and pernicious limits. Calhoun is quoted as authority for issuing bills of credit. Thomas Jefferson sanctioned the purchase and acquisition of Louisiana, an act more difficult to justify under the Constitution than any other act ever performed by the General Government prior to that time. Since then we have followed the precedent and acquired various other Territories. Indeed, it might be shown that no States rights politician has ever hesitated when in power to administer the affairs of Government upon principles completely at variance with those views expressed, whilst in opposition to some other existing Administration.

Before leaving this branch of the case, the writer of this opinion cannot refrain from expressing his dissent from some of the views expressed by counsel in the argument. One of the learned counsel for respondents asserts that the advocates of the doctrine that Congress has the power to make treasury notes a legal tender must show that power to be conferred under some one of the special grants of power enumerated in Section 8 of Article I. of the Constitution, or fail to sustain their cause.

That the doctrine that Congress may derive such power from the general nature of the authority conferred on them, and the

necessity of selecting the proper means of carrying out their delegated authority and maintaining the existence of the Government, is a new and startling theory. Yet this is precisely the theory maintained by the Supreme Court in the case of *McCulloch* v. *State of Maryland.* The Court there do not put the authority to charter a bank upon any one of the delegated authorities. But they put it on the doctrine that there are many expressly delegated powers, such as " to levy and collect taxes, to borrow money, to regulate commerce, to declare and conduct a war, to raise and support armies and a navy," etc., and that Congress must have the choice of means to aid and assist in carrying out these primary objects of the Government. .

If a bank will facilitate them in doing any or all these things, they have a right to charter it. Just so in this case, if the making of Treasury notes a legal tender is calculated to aid and facilitate the action of the Government in collecting revenue, conducting a war, preserving its own existence, and performing many other of the expressly granted powers of Congress, it is constitutional. The counsel failed to show any distinction, or even to attempt to show any between this case and the one referred to. Certainly he may read the opinion of the Supreme Court of the United States in the case referred to through from the first to the last line, and he will not find any place where the Court refers the power of Congress to charter a bank to any one of the expressly delegated powers. Yet he claims that the same doctrine, when asserted in *Maynard* v. *Newman,* is new, startling, and without precedent.

There is another portion of the opinion in *Maynard* v. *Newman* which drew from the same counsel some most remarkable comments.

In speaking of that portion of the opinion which treats of the first clause of the 8th Section of the Ist Article of the Constitution, counsel stated that if the author of the opinion had discovered to what the views therein expressed lead, he would have shrunk back startled and amazed as if he had suddenly discovered a yawning chasm in the path along which he had been daily accustomed to walk unconscious of the danger beneath.

He then went on to argue that such a construction of the Constitution would give almost unlimited power to Congress and create the most odious and revolting of despotisms.

Undoubtedly such a construction might somewhat enlarge the powers of Congress, yet they would not be unlimited. There are many express restrictions on the power of Congress in the Constitution.

If the Constitution authorized Congress to do any act which that body thought conducive to the common defense and general welfare of the whole people of the United States, and the perpetual maintenance of the General Government, except those things which are expressly prohibited in the Constitution, yet Congress would not then have more unlimited power than the State Legislatures generally have. Why, then, should we assume that under Congressional rule the Government would become an odious despotism?

Why assume that every man who fills the Executive chair of the nation or occupies a seat in Congress should be a Nero or Caligula, whilst every State Legislature is held pure and immaculate? As a general rule, the smaller and more insignificant the legislative body, the more is it liable to be influenced by selfish and corrupt motives. Take a school district in which there are only twelve voters, five of them owning all the real estate, and seven of them owning principally the personal property, and the seven will vote a tax exclusively on the real estate to build a school-house. If the majority should be the other way they will levy the tax exclusively on the personal estate. So, too, instances are not wanting of State legislators and Executives being purchased like cattle in the market.

Although there have doubtless been some corrupt members of Congress, there has never been a wholesale purchase of that body.

We may reasonably hope, from its numbers and respectability, that it never will be purchasable.

So far from Congress ever having played the part of tyrants, the only reasonable complaint of the people has been, that under the trying circumstances of the late civil war they failed to exercise that severity against the open enemies of the coun-

try which has under similar circumstances been exercised by every other Government in the world. We think it bad taste, to say the least of it, to charge that Government with a tendency towards despotism, which, during a four years' struggle for its existence has not only conducted a gigantic war against its revolted States with more humanity and forbearance than was ever shown by any other nation whilst engaged in such a war, but during the entire period has given protection alike to its patriotic citizens and to the thousands, we might perhaps say millions, of discontented residents within its acknowledged jurisdiction, who have openly sympathized with the public enemy, rejoiced at their victories, groaned over their defeats, and, as far as in their power lay, furnished money, means and men to overthrow the Government which was protecting them. The history of the world may be searched in vain for a parallel case.

But we feel that we have already said enough on this branch of the subject, and refer to the opinion in *Maynard* v. *Newman*, for the reasons for holding the Act of Congress constitutional.

Let us now examine the Act of Congress and of this State and see if they are in conflict.

The Act of Congress approved February 25, 1862, authorizes the issuance of one hundred and fifty millions of United States notes (more commonly called greenbacks or Treasury notes), and provides, among other things, that such notes shall be " lawful money and a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid."

The interest referred to is the interest on the public debt. Subsequently other laws were passed authorizing additional issues of United States notes, which are also made legal tenders. The question is, does the State law conflict with the law of Congress. The language of the Congressional Act is certainly very broad. It provides such notes shall be a legal tender for *all* debts. Now what is a debt? Bouvier defines a debt to be " a sum of money due by certain and express agreement." He further says.: " Debts arise or are proved by matter of record, as judgment debts; by bonds or special-

ties; and by simple contracts, where the quantity is fixed and specified, and does not depend on any future valuation to settle it."

Burrill gives Mr. Stephens as authority for the proposition that a debt is not a contract, "but the result of a contract."

He further says: "The word debt is of large import, including not only debts of record or judgments and debts by specialty, but also obligations arising under simple contract to a very wide extent." These are the technical and correct definitions of debt. Both authors show that in a popular sense and under some circumstances the word debt may be more, but never less comprehensive.

A promise, then, to pay a certain or definite sum in United States gold coin is a debt; for nobody disputes the fact that gold coin is money.

The State law provides in section 2d, that "In an action on an express contract, or obligation, for the direct payment of money, made payable in a specified kind of money or currency, judgment for the prevailing party, whether the same be by default or after verdict or decision of the Court or referee, shall follow the contract or obligation and be made payable in the kind of mony or currency specified therein." In section 3d it provides, when directing how the execution shall issue to enforce the judgment, as follows:

"If it be issued on a judgment made payable in a specified kind of money or currency, as provided in section 2 of this Act, it shall also require the Sheriff to satisfy the same in the kind of money or currency in which said judgment is made payable, and the Sheriff shall refuse payment in any other kind of money or currency; and in case of levy and sale of the property of the judgment debtor, he shall refuse payment from any purchaser at such sale in any other kind of money or currency than that specified in the execution."

Now, taking these two provisions together, does not the State law clearly provide that the United States notes shall not be a legal tender for certain debts which are not excepted in the Act of Congress.

The obligation to pay gold is a debt; the judgment on that obligation is also a debt. The State law prohibits the Sheriff

from taking United States notes or anything else but gold on a debt expressed to be payable in gold. Taking the two laws together, and they may be said to read thus: United States notes shall be lawful money and a legal tender for all debts except impost duties, interest on the public debt, and such debts as contracting parties may expressly agree shall be discharged in another and different kind of money.

In other words, here is an amendment, an additional exception engrafted on the law of Congress by a State Legislature. But this is not the only amendment to the Act of Congress passed by this State. Another section provides as follows: " The provisions of this Act shall apply to all actions or implied contracts or obligations contracted or incurred after the passage of this Act, when it shall appear on the trial to the satisfaction of the Court, jury or referee, that the debt or obligation was contracted or incurred upon the basis of any particular kind of money or currency." If the State Legislature could pass these sections modifying and controlling the Act of Congress, they could certainly pass others of a similar nature. They could add another section of the law declaring that all contracts made in the State should be taken, held and presumed to have been contracted on a gold basis, except where the contrary should be shown by the production of a written agreement specifying that payment was to be or might be made in United States notes. The Legislature might, by a still further clause, enact that when a contract was made payable in United States notes, and suit was brought on such contract, that no judgment should be rendered on said contract payable in such notes or in money generally, but a jury should ascertain what was the gold value of the notes the day they were by contract to be paid; that a judgment should be rendered for such amount, which should only be discharged with gold coin. The enactment of these several clauses would completely repeal the Act of Congress, and the parties to money contracts would stand precisely as if no such law had ever been passed. If Congress had never enacted that such notes should be legal tenders or lawful money, still a citizen might contract to pay an amount of them at a certain day. If he tendered them at the day fixed it would be a good tender as of personal property. If he failed

to tender them that day a cause of action would arise to recover their value in money.

Can it be contended that Congress may legally pass a law and a State Legislature may legally repeal it? If they cannot repeal it, can they modify it?

We have shown that the State law under discussion does modify the Act of Congress in two particulars. If two other modifications are made (we cannot see why the Legislature may not modify the .law in four particulars if it may in two) the effect will be to render the law entirely inoperative. We cannot see much difference between repealing a law in express terms, and so restricting and modifying its terms as to render it totally inoperative.

But it is said Congress has made both gold and United States notes a legal tender, and .a debtor may waive his right to pay in notes and pay in gold coin. That nobody disputes. If any man owes a debt, he may pay it in gold if he likes to do so, and has the gold wherewith to pay. The State could not prohibit him from so doing. But those who talk about a waiver under the provisions of the State law, do not seem to understand the meaning of the term they use. A waiver is defined to be "the relinquishment or refusal to accept of a right." Now in all, or at least most of these contracts made under the Specific Contract Act, the debtor binds himself at the very inception of the debt that he will pay in gold and not in paper money. Then if the contract is a legal one, he never did have the right or power to discharge his debt in paper money.

Why, then, talk about waiving a right he never possessed? It is true that when a new note is given for an antecedent debt, it might, with propriety, be said that if the old debt was payable in money generally, and the new note stipulated for payment in gold coin, this would be a waiver of a pre-existing right. But in most cases gold notes are made for a consideration which passes when the note is executed. In such case the debtor (supposing the State law to be valid) never possessed the right to pay in anything but gold. How could he waive a right he never possessed? The use of this term is simply an evasion of the true issue. The true question is this: Can a

Milliken *et al. v.* Sloat.

State Legislature license two of its citizens to contract that a positive law of Congress shall be inoperative and void so far as it affects their pecuniary transactions? The proposition put in plain English would be laughed at. Hence the necessity of covering it up and concealing the true point by the use of false terms.

There can be no doubt, as a general rule, that a man may, in a civil action, waive most of his rights. But parties to actions cannot waive the rights of strangers nor supersede the laws of the land.

In those States where they have statutes making notes given for usury and on gaming considerations void, one who is sued on such notes may fail to answer and thereby waive his right to make such defense.

But suppose a case where a party gives a note for usury or for a gaming consideration, and inserts a clause in the note, whereby he agrees not to plead the usurious or gambling consideration of the note as a defense. When he is sued he does, notwithstanding his promise to the contrary, plead usury or gaming, as the case may be, and the other party puts in his replication admitting the illegality of the consideration, but setting up this special contract not to put in the plea of such illegality, would not such a replication be received by any Court as a pleasant jest rather than a serious defense? Is there a lawyer in the world, having a particle of common sense or the least regard for his character and reputation, who would attempt seriously to support such a pleading by argument? Any lawyer would say at once, this is absurd.

Two people, by their private agreement, cannot suspend the operation of a positive statutory enactment. Yet is not that case precisely the same as the one under consideration, with this exception?

In the case put, the parties, upon their own authority, attempt to suspend the operation of a public Act.

In this case two parties attempt to suspend or modify the operation of an Act of Congress and plead a license of the State for so doing.

Another instance, a party wishing to raise money, mortgages his estate and agrees in the instrument of mortgage that if the

debt is not paid at maturity he will waive his right to redeem, and the title of the estate shall thereupon pass absolutely to the mortgagee. There is no express law forbidding such contracts, but they are thought to be hard, unfair and oppressive. Courts have universally disregarded such agreements (or waivers as perhaps respondents would rather call them), and allowed the mortgagor to redeem on equitable terms, although the debt was not paid or tendered at maturity.

These examples show that Courts do not regard or enforce contracts made either in violation of public statutes or in violation of public policy.

We are told that the law requires of indorsers that a demand should be made by them at the proper time and place on the maker of a note, and if he fails to pay, prompt notice should be given to the indorser, and if these things are not done the indorser is not liable.

But if at a time a man indorses a note he writes on the back of the note, " I waive demand and notice of non-payment," he is liable notwithstanding there is no demand and no notice of non-payment.

We are told this is a case exactly like that of waiving the right to pay a debt in a particular kind of currency.

This is certainly an ingenious argument, and might be well calculated to deceive a man who was not a lawyer. But the Court should be presumed to have some little knowledge of the reason on which rules of law are founded. Why is an indorser liable at any time ?

Simply because he has contracted to be liable. When he writes his name in blank on the back of a note, it is in effect signing a written contract, or rather affixing his signature to a blank contract which he authorizes another to fill up to this effect : " For value received, I assign the within note to A B, and agree that if he presents it to the maker the day it is due, demands payment, and in case of a refusal or failure to pay notifies me promptly, I will be responsible for amount of note, interest and costs."

But if at the time he writes his name he also indorses on the note, " I waive demand and notice," then his contract is to this effect, " I assign the within note to A B, and if the maker does

not pay the same at maturity, I will be responsible for amount of note and interest."

Here the responsibility of the indorser is changed because he has made a different contract. There is not a word in the law saying the indorser may not make the one contract or the other. He has made in either case a legal contract (one which contravenes no written nor unwritten law), not in express words, but by implication arising from the nature and general understanding of the parties. Just as a party by implication of law agrees and contracts to pay for goods he orders a merchant to send to his house or store, though in direct words he says nothing about paying. But if there were a statutory law declaring that no indorser of a promissory note or bill of exchange should be liable on his indorsement, whatever the form thereof, without due notice, demand and protest as required by the law merchant, then no contract of the parties could dispense with or waive the operation of that law. So in this case the parties cannot by contract, waive, destroy or set aside the express letter of the law of Congress.

We have in a manner, at least satisfactory to ourselves, shown this Act of the Legislature is in direct conflict with the very words of the Act of Congress.

We think it may as readily be shown it is in conflict with the policy of Congress. The Act says the notes to be issued shall be a legal tender for all debts, etc., except, etc. All debts may be considered under two classes.

First—Debts contracted before the passage of this Act. Second—Debts contracted subsequent to its passage. It has been questioned whether the Act was intended to be retroactive and apply to former debts, but no one questions that it was intended to apply to future or subsequent debts. If the law applies to pre-existing debts (and it has been so held by this and other Courts), Congress may have been influenced by two motives in making them a legal tender for this class of debts.

First, to afford a relief to the debtor class who would otherwise have been ruined by the exorbitant demand for, and sudden rise in, the price of gold. In fact from its almost total withdrawal from circulation in the Eastern States. The only

other motive that could have actuated Congress in making them a legal tender for this class of debts, must have been to render the notes more valuable and to prevent as far as practicable their greater depreciation in the market.

In making them a legal tender for future debts, they must have been influenced mainly by the latter motive. Even without the Act making them lawful money and a legal tender, parties might have contracted for the payment of such notes in their ordinary business, and although without the Act making them lawful money, etc., no judgment could have been discharged in such paper, the money judgments on such contracts would only have been for the cash value of the notes, which would not have been particularly oppressive.

Then we can see no object that could have influenced Congress to make them a legal tender for future debts, but that of making the notes more current, giving them more value in the market, and checking as far as might be their depreciation. Any law or contract which would prevent their being received as a legal tender for any purpose other than those exceptions made by Congress, would have the direct effect of diminishing their circulation, decreasing their value, and to some extent increasing their depreciation. We think, then, that the law of the State, and contracts made under it, are directly in conflict with the law of Congress, and contrary to the policy of the Government.

Being contrary to the letter of the law, the State Act is ineffectual to prevent the United States notes from being a legal tender for any debt, whether the same be evidenced by matter of record [judgment], by specialty or by simple contracts.

Whether debts contracted in violation of the spirit of the law, in contravention of public policy, and with a view to evade the letter of the law, are not absolutely void, is a question which has not been argued or presented before this Court, and on which it is not necessary to pass.

But it is contended that whatever may have been the effect of the law of Congress we have been considering, that that body afterwards passed laws in effect licensing and legalizing loans of gold, fixing the stamp duties which should be paid on

such loans, etc., and that it cannot be contended that Congress would license an Act to be done and still deny a party all benefit arising from said Act. Deny him the right to enforce a contract after he had paid the Government for the right to enter into it.

The first Act referred to is one passed, or rather approved, March 3, 1863, entitled "An Act to amend an Act entitled an Act to provide internal revenue to support the Government and pay interest on the public debt," approved July 1, 1862, and for other purposes.

This Act has been repealed, and is not now a part of the law of the country. But the note sued on in the case under consideration was executed in April, 1864, while this Act was in force. Let us see how it is to be affected by the Act referred to. Section 4 provides as follows—we quote only such portions as can affect the question being discussed:

"That all contracts for the purchase or sale of gold or silver coin, or bullion, and all contracts for the loan of money or currency secured by pledge or deposit, or other disposition of gold or silver coin of the United States, if to be performed after a period exceeding three days, shall be in writing or printed, and signed by the parties or their agents or attorneys, and shall have one or more adhesive stamps as provided in the Act of which this is an amendment, equal in amount to one-half of one percentum, and interest at the rate of six percentum per annum on the amount so loaned, pledged or deposited.

"And no loan of currency or money on the security of gold or silver coin of the United States as aforesaid, or of any certificate or other evidence of deposit payable in gold or silver coin shall be made, exceeding in amount the par value of the coin pledged or deposited as security; and any such loan so made or attempted to be made, shall be entirely void. Provided, that if gold or silver coin be loaned at its par value it shall be subject only to the duty imposed on other loans."

Section 5 is as follows: "That all contracts, loans, or sales of gold and silver coin and bullion not made in accordance with this Act, shall be wholly and absolutely void."

This Act indirectly licenses contracts for the sale, purchase

and delivery of gold coin. That is, it levies a tax of half of one per cent. on such transactions, and this may be said to be a sort of indirect license. Now is a note for the payment of certain sums of money in gold coin a contract for the sale and delivery of gold? If there is no distinction between the contracts, then the contract sued on in this case is utterly void for want of the proper stamp of half of one per cent. of its face, and the appellant would be in a much better condition than he was placed by the former decision of the Court. If such be the case the judgment is erroneous, and the appellant by prosecuting an appeal from the judgment can get rid of the whole debt. He would be neither bound to pay in coin nor paper money. This we presume is proving too much for the respondents.

But if a note to pay a debt in gold, and a contract for the *delivery of gold,* are not the same thing, then this law has nothing to do with the former Act of Congress declaring certain paper money should be a legal tender for *all debts.* The respondents must take one horn or the other of the dilemma.

It is said that although the fourth section of this Act speaks only of the purchase, sale and delivery of gold, avoiding all such words as " debts," " loans," " borrow," " pay," etc., which are the distinctive words used in money transactions, still the fifth section declares that all contracts, loans, or sales of gold or silver coin and bullion, not made in accordance with this Act, shall be wholly and absolutely void.

It is attempted here to connect loans with gold and silver coins. If that is the true meaning, then every loan of gold coin made on this coast between March 3, 1863, and June 30, 1864, is entirely void, and a party having paid such loans within the last twelve months may recover the amount back, unless the repeal of the law has taken away their remedy. Any way, all notes outstanding, executed for gold loaned, would be utterly void. We say this because no man on this coast ever thought of putting stamps to the amount of half of one per cent. on such notes. Nor are notes signed by both parties, as the Act of Congress requires gold contracts to be under penalty of forfeiture.

But we take a different view of this Act. We think the

contracts referred to in section 4 are contracts for the delivery of gold coin or bullion made in such form as not to be *technical debts;* that Congress passed the law of March 3, 1863, tolerating rather than sanctioning such transactions. It imposed such burthens on those kind of contracts as to discourage them. The word loans in the fifth section does not refer to loans of gold, but loans of paper on a deposit of gold beyond its par value, which is prohibited in section 4. If parties make a contract for the delivery of gold, and so make it as not to be a technical debt, then if the gold is not delivered, they would have their common law remedy—the action in covenant or assumpsit for the value of the gold when it should have been delivered.

This would be the subject of inquiry and assessment before a jury or other proper tribunal. But if the obligation be in the form of a debt, what in law is a technical debt, a direct promise *to pay money,* whether it be money generally or any kind of currency made money by law, it may be discharged by a tender of money without any inquiry of damages.

June 17, 1864, an Act of Congress was approved prohibiting purchases of gold on time; prohibiting sales of gold by those who did not have it at the time of sale, etc., and making various other provisions to check gambling in gold. This law was repealed in fifteen days after it was passed. How that law is to affect the question before us we do not understand. There is nothing in it repealing or interfering with the Act of Congress which says United States notes shall be a legal tender for *all debts.* There is no conflict, and never was a conflict, that we can see, between the two. If there ever was, this latter law is repealed and out of the way. It is said that such Acts show that it was not the policy of Congress to prohibit gold contracts. We think differently. But suppose we admit that it was not the policy to prohibit gold contracts· of various kinds, what has that to do with the question before us?

In all civilized countries (so far as we are aware), gambling debts have either been held void by the Courts on principles of public policy and natural justice, or else declared void by special legislative enactment. But in many civilized countries they license gambling houses under certain restrictions. We

never heard that the licensing a gambling house gave validity to gambling debts; that a note given for a gambling consideration would be good directly in opposition to the letter of the law declaring all such notes void, because it was given in a licensed gambling house.

If Congress, conscious of its inability to entirely prevent gambling in gold, licenses such transactions upon the payment of certain duties, why should that be construed a repeal of a positive and plain enactment that paper money should be a legal tender for all private debts. We have decided this case, not on the policy of the Government (although we think we might have come to the same conclusion on that ground), but on the very letter of the law which says this paper money shall be a legal tender for *all debts*, with two exceptions. And we know, and every lawyer knows who knows anything, that a promise to pay fifteen hundred dollars in United States gold coin is a debt under any definition of the word that ever was given by a sane man, whether that definition was the strict technical meaning of the word or the more extended meaning which the word sometimes has in common parlance. Indeed, no counsel has denied this was debt in its strictest and most technical sense.

But they say it is not such a debt as Congress contemplated. The word debt has two meanings, one is technical and limited in its application. In this sense it is generally understood by lawyers. It has a rather less technical and more extended signification as used among non-professional men. When the expression all debts was used, it either meant *all* debts in the technical sense, or all debts in the popular sense, or all debts that are included in either sense. This debt is included in either definition, and in both, so it must be covered by the Act.

But it is said Congress did not mean *all debts.* It could not have been the intention of Congress to include debts payable in wheat, corn, horses, etc.; that these are debts, but of such a nature that as debts they can only be discharged by a tender of the specific property; that if such tender is not made, then an action arises to recover in damages the value of the article or other property which should have been ten-

dered; that no tender of money can discharge such a debt; that a promise to pay gold coin is of the same nature; that by the contract it is deprived of its character of a simple indebtedness, and assumes the nature of a property debt payable in wheat or corn, and can only be discharged by a delivery of the specific property. This is rather a specious argument to captivate those who are ignorant of all legal principles, but certainly ought not to be expected to mislead a Court of common intelligence.

In the first place, it is not like a note or agreement for the payment of wheat, etc., because the latter are not technically debts; the note for gold coin is a technical debt. And the words "all debts" must be understood to include all technical debts (which is a very limited class of contracts), although it might not be construed to include the more numerous class of contracts embraced by that term as popularly employed. But there is a further answer to this proposition.

Respondents have assumed and asserted that a debt payable in wheat cannot be discharged by a tender of money. When they made this assertion they had not looked at their law books on this subject, or they would not have made so palpable a blunder. If one gives a note or obligation in this form: "I promise to pay A B one thousand dollars in good merchantable wheat," delivered at his mill on or before a certain day, there is not the slightest doubt it may be discharged by the payment or a tender of one thousand dollars. If there is any decision to the contrary we have never seen or heard of it. If the note be in this form, "I promise to pay A B one thousand dollars in wheat *at one dollar per bushel,*" the Courts have been divided as to whether a thousand dollars will or will not discharge the contract. Some Courts have said this is a debt of one thousand dollars which the debtor has the right to discharge at his option with one thousand bushels of wheat. Others have said it is a contract for one thousand bushels of wheat, and if wheat is worth two dollars per bushel at the time it is to be delivered, the obligation can only be satisfied by the delivery of one thousand bushels of wheat, or the payment of damages equal in amount to the value of one thousand bushels the day it should have been delivered.

Milliken *et al. v.* Sloat.

But in any case where a certain sum is to be paid by the delivery of personal property at its market value the day of delivery, that contract may be discharged by tendering the money in lieu of the property. (See on this whole subject, Parsons on Contracts, vol. 2, pp. 490 to 492, and note Q, and cases there cited.)

The case of *Cole* v. *Ross*, 9 B. Monroe, 393, cited by the Supreme Court of California in the case of *Galland* v. *Lewis*, to show that money could not to be tendered for a specific amount payable in property, is one of those class of cases in which not only the amount to be paid but the price of the article to be delivered is fixed. There was a promise to pay three thousand three hundred and thirty-three dollars and thirty-three and one-third cents in pig metal at twenty-nine dollars per ton. Now, if you divide the sum of money by the twenty-nine, you find the dividend will be nearly one hundred and fifteen. Then this was a contract to pay three thousand three hundred and thirty-three dollars and thirty-three and one-third cents, which the debtor was to have the privilege of paying by delivering one hundred and fifteen tons of pig metal; or else it was an absolute agreement to deliver one hundred and fifteen tons of pig metal. Different Courts have construed such contracts each way. The Kentucky Court put the latter construction on it. That it was a contract to deliver one hundred and fifteen tons of pig metal. Pig metal had risen above twenty-nine dollars per ton in value before the day of delivery; consequently three thousand three hundred and thirty-three dollars and thirty-three and one-third cents would not discharge the obligation. But if the obligation had been to pay three thousand three hundred and thirty-three dollars and thirty-three and one-third cents in pig metal at its market value the day it was to be delivered, then we may clearly infer from the remarks of the Court in the case cited that a tender of the money would have discharged the obligation. And such is the tenor of all the decisions on this subject. In other words, not only all technical debts, but all contracts which are substantially debts, although they call for the delivery of personal property other than money, may be discharged in whatever kind of money the Government declares a legal tender.

Again, if this and similar contracts are what respondents claim them to be, mere contracts for the delivery of personal property, which can be performed only by the delivery of the specific article promised, then there was no necessity for the passage of what we call the " Specific Contract Act." For if the debtor refused to deliver the gold coin at the day promised the creditor could sue and recover the value of the coin the day it should have been delivered.

The common law gave an adequate remedy. Why, then, pass the law under consideration? Simply to call things by wrong names, to term a simple judgment for money a judgment [decree] for the specific performance of a contract. To enable Courts to trample upon and spurn a law of Congress, in a manner not quite so palpable or so easily comprehended by the community as it would have been if they had disregarded the law without all this legislative subterfuge.

We are earnestly implored, if we cannot find any legal ground to sustain this Act, that we should sustain it on grounds of public policy. Twelve months ago the money lenders assured the Legislature if they would pass this law the business of the State would be restored to a prosperous condition. The law was passed, and within twelve months the assessed value of the property in the State has diminished more than one-third. Nearly the entire population is embarrassed and groaning under debts bearing such a rate of interest as must reduce them to bankruptcy if they cannot get a change of laws and financial policy. We certainly do not see anything so encouraging in the system as to induce us to disregard all legal principle and rules of common sense to sustain it.

The judgment rendered by this Court before the granting of a rehearing must stand as the judgment of the Court.

By the Chief Justice.

As the precise question involved in this case was thoroughly considered and passed upon by the Supreme Court of California in the case of *Carpentier* v. *Atherton*, 25 Cal., I deem it unnecessary to do more than to refer to the opinions in that case for the reasoning which seems to me sufficient to justify my dissent from the conclusions of my associates in the case at bar.