SANDPOINTE APARTMENTS, LLC, a Nevada Limited Liability Company; and STACY YAHRAUS-LEWIS, an Individual, Petitioners, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and for THE COUNTY OF CLARK; and THE HONORABLE ELIZABETH GOFF GONZALEZ, District Judge, Respondents, and CML-NV SANDPOINTE, LLC, a Florida Limited Liability Company, Real Party in Interest.

No. 59507

November 14, 2013                    313 P.3d 849

[Rehearing denied January 24, 2014]

*Marquis Aurbach Coffing* and *Frank M. Flansburg, III*, and *Candice E. Renka*, Las Vegas, for Petitioners.

*Lewis & Roca LLP* and *Daniel F. Polsenberg*, Las Vegas; *Cotton, Driggs, Walch, Holley, Woloson & Thompson* and *Richard F. Holley, Victoria L. Nelson*, and *William N. Miller*, Las Vegas, for Real Party in Interest.

*Holland & Hart LLP* and *Jeremy J. Nork* and *Frank Z. LaForge*, Reno, for Amicus Curiae Branch Banking and Trust Company.

*Legislative Counsel Bureau Legal Division* and *Brenda J. Erdoes*, Legislative Counsel, and *Kevin C. Powers*, Chief Litigation Counsel, Carson City, for Amicus Curiae Legislature of the State of Nevada.

*The O'Mara Law Firm, P.C.*, and *David C. O'Mara*, Reno, for Amicus Curiae Nevada Bankers Association.

*Sylvester & Polednak, Ltd.*, and *Jeffrey R. Sylvester* and *Allyson R. Noto*, Las Vegas, for Amicus Curiae RADC/CADC Venture 2010-2, LLC.

*Alfred M. Pollard*, Washington, D.C., for Amicus Curiae Federal Housing Finance Agency.

*Joseph Brooks*, Arlington, Virginia, for Amicus Curiae Federal Deposit Insurance Corporation.

Before the Court EN BANC.

## OPINION

By the Court, SAITTA, J.:

In this opinion, we address NRS 40.459(1)(c), a statute limiting the amount of judgments in instances where a right to obtain a judgment against the debtor, guarantor, or surety has been transferred from one person to another. NRS 40.459(1)(c) was added to Nevada's law by Assembly Bill 273, which provided that NRS 40.459(1)(c) would "become effective upon passage and approval." 2011 Nev. Stat., ch. 311, §§ 5, 7, at 1743, 1748. We conclude that NRS 40.459(1)(c) would have an improper retroactive effect if applied to the facts underlying this writ petition. Because the language of the enrollment section does not overcome the presumption against retroactivity, NRS 40.459(1)(c) only applies prospectively. We therefore conclude that the limitations in NRS 40.459(1)(c) apply to sales, pursuant to either judicial foreclosures or trustee's sales, occurring on or after the effective date of the statute.[1] We further conclude that in cases where application of NRS 40.459(1)(c) would not have a retroactive effect, it applies to any transfer of the right to obtain a deficiency judgment, regardless of when the right was transferred. Accordingly, we deny extraordinary writ relief.

### FACTS AND PROCEDURAL HISTORY

In 2007, Silver State Bank loaned $5,135,000 to petitioner Sandpointe Apartments, LLC, for the construction of an apartment complex. Sandpointe obtained the loan by executing a promissory note in favor of Silver State Bank, secured by, among other things, a deed of trust to the real property acquired with the loan funds. The deed of trust contained a power of sale provision. Petitioner Stacy Yahraus-Lewis personally guaranteed the loan.

In 2008, the Nevada Financial Institutions Division closed Silver State Bank and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver. In 2009, Sandpointe's loan matured, and Sandpointe defaulted by failing to repay the loan in full. In 2010, pursuant to a large structured sale, the FDIC sold the loan

---

[1]Trustee's sales are colloquially referred to as nonjudicial foreclosures. However, we will use the more precise term—trustee's sale.

and the guarantee to Multibank. Multibank, in turn, transferred its interest in the loan and the guarantee to its wholly owned subsidiary, real party in interest CML-NV Sandpointe, LLC, a single purpose entity created by Multibank to facilitate and pursue collections on the loan. In early 2011, CML-NV elected to pursue its rights under the deed of trust's power of sale provision, and a trustee's sale was held at which CML-NV purchased the property securing the loan for a credit bid of $1,440,000.

Shortly thereafter, the Nevada Legislature unanimously passed Assembly Bill 273, which, in relevant part, limits the amount of a deficiency judgment that can be recovered by persons who acquired the right to obtain the judgment from someone else who held that right. On June 10, 2011, the Governor signed Assembly Bill 273 into law, and the relevant provision was codified as NRS 40.459(1)(c).

On June 27, 2011, CML-NV filed a complaint in district court against Sandpointe and Yahraus-Lewis for deficiency and breach of guaranty. Yahraus-Lewis later moved for partial summary judgment, requesting that the district court apply the limitation contained in NRS 40.459(1)(c) to CML-NV's action. CML-NV opposed the motion and filed a countermotion for partial summary judgment, arguing that NRS 40.459(1)(c) could not apply retroactively to the action.

The district court held a hearing on the motion and countermotion, at which time the court granted CML-NV's countermotion for summary judgment, concluding that NRS 40.459(1)(c) only applies to loans entered into after June 10, 2011. Arguing that the district court incorrectly determined that applying NRS 40.459(1)(c) in this instance would constitute retroactive operation of the statute and that, even if the court was correct, the statute allows for retroactive application, Sandpointe and Yahraus-Lewis now petition this court for a writ of mandamus or prohibition directing the district court to apply the limitation contained in NRS 40.459(1)(c) to CML-NV's deficiency judgment.

## DISCUSSION

"A writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station or to control an arbitrary or capricious exercise of discretion." *Int'l Game Tech., Inc. v. Second Judicial Dist. Court*, 124 Nev. 193, 197, 179 P.3d 556, 558 (2008); NRS 34.160. "A writ of prohibition is appropriate when a district court acts without or in excess of its jurisdiction. . . . Because both writs of prohibition and writs of mandamus are extraordinary remedies, we have complete discretion . . . whether to consider them." *Cote H. v. Eighth Judicial Dist. Court*, 124 Nev. 36, 39, 175 P.3d 906,

907-08 (2008). We have long recognized that writ relief is not appropriate when there is an adequate and speedy remedy at law available. *Int'l Game Tech.*, 124 Nev. at 197, 179 P.3d at 558; *see* NRS 34.170; NRS 34.330. Therefore, "[w]e generally will not exercise our discretion to consider petitions for extraordinary writ relief that challenge district court orders denying motions for summary judgment, unless summary judgment is clearly required by a statute or rule, or an important issue of law requires clarification." *ANSE, Inc. v. Eighth Judicial Dist. Court*, 124 Nev. 862, 867, 192 P.3d 738, 742 (2008).

This petition arises from the Legislature's recent amendments to the statutes governing deficiency judgments. As noted by the district court, the interpretation of the amendments raises important issues that affect many people in this state. Given the current economic climate of this state, these issues will undoubtedly recur, and they have already created considerable confusion in the lower courts. Indeed, although NRS 40.459(1)(c) was enacted less than two years ago, its application has already resulted in conflicting decisions in the district courts. Because there are important issues of law with statewide impact requiring clarification, and because an appeal from the final judgment would not constitute an adequate and speedy legal remedy, given the urgent need for resolution of these issues, we elect to exercise our discretion to entertain the merits of the petition.

### Policy underlying Assembly Bill 273 and NRS 40.459(1)(c)

The recent recession severely affected Nevada's real estate market. As a result, a large secondary market emerged wherein various entities, including collection companies, would purchase distressed loans at deep discounts. These entities would then exercise their power of sale or judicially foreclose on the collateral securing the loans and seek deficiency judgments against the debtors and guarantors based upon the full indebtedness. *See* Hearing on A.B. 273 Before the Assembly Commerce and Labor Comm., 76th Leg. (Nev., March 23, 2011).

In response, following the 2011 legislative session, Assembly Bill 273 was signed into law. It is codified, in pertinent part, in NRS 40.459, which is entitled "Limitations on amount of money judgment." Subsection (1)(c)—the subject of the present litigation—provides that "[i]f the person seeking the judgment acquired the right to obtain the judgment from a person who previously held that right," then the person seeking the judgment may only recover

> the amount by which the amount of the consideration paid for that right exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater, with interest from the date of sale and reasonable costs[.]

During a committee hearing on Assembly Bill 273, Assembly-man Marcus Conklin, primary sponsor of the bill, described the intent of Assembly Bill 273 as follows:

> We are preventing a creditor from profiting from a judgment in excess of the amount the creditor paid for the right to pursue such a judgment.
>
> . . . .
>
> . . . [T]he bill prevents a person who has purchased the rights to a loan from receiving a judgment for more than what he paid plus interest.
>
> . . . .
>
> [I]f a bank chooses to pursue someone for a deficiency judgment in a situation where a house was purchased for $200,000 and the value dropped to $100,000—and the bank decided to pursue the homeowner for the $100,000 and then sold it to a collection agency for $20,000—all the collection agency could collect is the $20,000 plus interest and fees. If the bank was willing to accept $20,000, then why did the bank not negotiate with the homeowner for the $20,000? The homeowner's credit is being destroyed for $20,000, but it appears on his credit report as $100,000. Why not have the discussion take place between the original lender and the homeowner for the true amount the bank is willing to accept in the first place?

Hearing on A.B. 273 Before the Assembly Commerce and Labor Comm., 76th Leg. (Nev., March 23, 2011). In other words, NRS 40.459(1)(c) was designed to prevent profiteering and to encourage creditors to negotiate with borrowers. To accomplish these goals, the statute greatly limits the amount of a deficiency judgment that a successor in interest can recover, thereby discouraging these entities from purchasing notes or mortgages "for pennies on the dollar." Hearing on A.B. 273 Before the Senate Judiciary Comm., 76th Leg. (Nev., May 3, 2011). More specifically, NRS 40.459(1)(c) limits the amount of a judgment that a successor in interest can recover to the difference between the fair market (or actual sale) value of the property that is foreclosed upon and the amount that the successor paid to acquire an interest from the original creditor.

*NRS 40.459(1)(c)'s retroactive effect*

Sandpointe and Yahraus-Lewis argue that applying NRS 40.459(1)(c) to deficiency judgments arising from sales, pursuant to either judicial foreclosures or trustee's sales, that occurred before the statute took effect would not constitute retroactive op-

eration of the statute and that, even if it did, the Legislature so intended. Whether applying a statute in a particular instance constitutes retroactive operation is a question of law that we review de novo. *See Pub. Emps.' Benefits Program v. Las Vegas Metro. Police Dep't (PEBP)*, 124 Nev. 138, 146, 179 P.3d 542, 548 (2008). Further, even in the context of a writ petition, "[s]tatutory interpretation is a question of law that we review de novo." *Int'l Game Tech.*, 124 Nev. at 198, 179 P.3d at 559.

Substantive statutes are presumed to only operate prospectively, unless it is clear that the drafters intended the statute to be applied retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994); *PEBP*, 124 Nev. at 154, 179 P.3d at 553; *Cnty. of Clark v. Roosevelt Title Ins. Co.*, 80 Nev. 530, 535, 396 P.2d 844, 846 (1964). The presumption against retroactivity is typically explained by reference to fairness. *Landgraf*, 511 U.S. at 270. As the Supreme Court has instructed, "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Id.* at 265. Moreover, "[i]n a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions." *Id.* at 265-66.

"[D]eciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Id.* at 268. "Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." *Id.* at 270. Broadly speaking, courts "take a 'commonsense, functional' approach" in analyzing whether applying a new statute would constitute retroactive operation. *PEBP*, 124 Nev. at 155, 179 P.3d at 553 (quoting *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 321 (2001)). Central to this inquiry are "fundamental notions of 'fair notice, reasonable reliance, and settled expectations.'" *Id.* at 155, 179 P.3d at 554 (quoting *St. Cyr*, 533 U.S. at 321). Ultimately, a conclusion regarding retroactivity "comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Landgraf*, 511 U.S. at 270.

"All laws have connections with the past," however. 2 Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Con-*

*struction* § 41:2, at 390 (7th ed. 2009). As such, a statute does not operate ''retrospectively'' merely because it ''draws upon past facts,'' *PEBP*, 124 Nev. at 155, 179 P.3d at 553, ''or upsets expectations based in prior law.'' *Landgraf*, 511 U.S. at 269. Rather, '' '[a] statute has retroactive effect when it ''takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past.'' ' '' *PEBP*, 124 Nev. at 155, 179 P.3d at 553-54 (alteration in original) (quoting *St. Cyr*, 533 U.S. at 321 (quoting *Landgraf*, 511 U.S. at 269)).

> *NRS 40.459(1)(c) attaches a new disability and would impair vested rights if applied to deficiencies arising after trustee sales that took place before the statute became effective*

Sandpointe and Yahraus-Lewis contend that applying NRS 40.459(1)(c) here would not affect any of CML-NV's vested rights because (a) it simply clarifies existing law, as provided in NRS 40.451, rather than creating a new obligation; and (b) CML-NV's right to a deficiency does not vest until the entry of a deficiency judgment, which has not yet occurred.

### NRS 40.451

NRS 40.451, which was enacted in 1969 and amended in 1989, reads:

> As used in NRS 40.451 to 40.463, inclusive, ''indebtedness'' means the principal balance of the obligation secured by a mortgage or other lien on real property, together with all interest accrued and unpaid prior to the time of foreclosure sale, all costs and fees of such a sale, all advances made with respect to the property by the beneficiary, and all other amounts secured by the mortgage or other lien on the real property in favor of the person seeking the deficiency judgment. *Such amount constituting a lien is limited to the amount of the consideration paid by the lienholder.*

(emphasis added); 1969 Nev. Stat., ch. 327, § 3, at 572-73; 1989 Nev. Stat., ch. 750, § 8, at 1769. The amount of ''indebtedness'' is then used in determining the amount of a deficiency judgment against the borrower under NRS 40.459(1)(a) and (b), which allow for judgments no greater than the amount by which the indebtedness exceeds the fair market value or the actual sale amount, whichever results in the lesser judgment.[2]

---

[2]Although NRS 40.459(1)(a) and (b) were renumbered in 2011, no substantive changes were made to those provisions. 2011 Nev. Stat., ch. 311, § 5, at 1743.

In arguing that NRS 40.451 already limits deficiency judgments to the amount of consideration paid and thus that NRS 40.459(1)(c) does not effect a substantive change to the law, Sandpointe and Yahraus-Lewis misread NRS 40.451. " 'Where the language of a statute is plain and unambiguous and its meaning clear and unmistakable, there is no room for construction, and [we] are not permitted to search for its meaning beyond the statute itself.' " *Walters v. Eighth Judicial Dist. Court*, 127 Nev. 723, 727, 263 P.3d 231, 234 (2011) (quoting *Madera v. SIIS*, 114 Nev. 253, 257, 956 P.2d 117, 120 (1998)). When read as a whole, as it must be, *Int'l Game Tech.*, 124 Nev. at 200-01, 179 P.3d at 560, NRS 40.451 defines a successor lienholder's "indebtedness" as the amount the successor paid for the mortgage or lien, *as well as* "all interest accrued and unpaid prior to the time of foreclosure sale, all costs and fees of such a sale, [and] all advances made with respect to the property by the beneficiary." NRS 40.451. The statute's last sentence—limiting a lien amount to the amount of consideration paid—plainly does not purport to limit the total amount of the judgment that may be awarded in a deficiency judgment action. Instead, it limits only the lien amount, and as set forth in that statute, the lien amount is only one factor among several in determining the total amount of indebtedness, which is then used to determine the deficiency judgment amount. NRS 40.459(1)(a) and (b). Therefore, NRS 40.459(1)(c), which limits the total judgment amount, is different from NRS 40.451, which places a limit only on the first variable in the equation used to fix the amount of indebtedness.

On the other hand, NRS 40.459(1)(c)'s plain meaning creates a new limitation on the amount a person may recover in a deficiency action whenever there has been a transfer of the right to obtain a deficiency judgment. *See Walters*, 127 Nev. at 727, 263 P.3d at 234. For purposes of applying NRS 40.459(1)(c), a holder of the promissory note and deed of trust may transfer that right to obtain a deficiency judgment as a bundle of rights secured in a promissory note and deed of trust. *See Edelstein v. Bank of N.Y. Mellon*, 128 Nev. 505, 522, 286 P.3d 249, 260 (2012) (determining that when a person holds the note and a beneficial interest in the deed of trust securing the note, the person may proceed with a judicial foreclosure or trustee's sale). However, NRS 40.459(1)(c) now provides that if such a transfer occurs, the successor holder will be limited in the amount that he will be able to recover in a deficiency action.

Further, even if NRS 40.459(1)(c) had not changed the law as to deficiency judgments against borrowers, it clearly changed the law as to judgments against guarantors following a sale, pursuant to a judicial foreclosure or a trustee's sale. *See* NRS 40.465 (stating that its definition for indebtedness applies to NRS 40.495). NRS 40.465 provides a separate and distinct definition of indebtedness that applies in an action against a guarantor. For purposes of the guarantor statutes, NRS 40.465 provides similarly to NRS 40.451 that indebtedness ''means the principal balance of the obligation, together with all accrued and unpaid interest, and those costs, fees, advances and other amounts secured by the mortgage or lien upon real property.'' This definition of indebtedness lacks the final sentence of NRS 40.451, however, and thus pre-2011, guarantors of a note were not protected by any consideration-amount limit in the factors used to determine indebtedness. The 2011 changes to NRS 40.459(1), however, apply to guarantors, and thus guarantors are now afforded the same protections as borrowers when the right to obtain a judgment has been sold to a successor. NRS 40.459(1)(c). Therefore, NRS 40.459(1)(c) creates a new limitation on the amount recoverable against guarantors, when the successor elects to judicially foreclose or conduct a trustee's sale.

Thus, contrary to Sandpointe and Yahraus-Lewis's claims, neither NRS 40.451 nor any other pre-2011 statute or rule limits the amount of the judgment that a successor in interest may recover in a deficiency judgment action to the amount the successor paid to acquire the interest in the obligation. To suggest otherwise is to confuse the intent of NRS 40.459(1)(c). Following the enactment of NRS 40.459(1)(c), a successor holder is now limited in its recovery, in a deficiency action or suit against the guarantor, to the sum by which the amount paid for the ''right to obtain the judgment'' exceeds the greater of the fair market value or the actual sale price. Under NRS 40.459(1)(c), no award may be made for other amounts that the successor in interest may have incurred following the acquisition of the right to obtain the judgment, such as accrued interest, costs and fees, and any advances, as provided in NRS 40.451 and NRS 40.465. Thus, NRS 40.459(1)(c) attaches a new disability to a successor lienholder's ability to obtain a deficiency judgment.

We therefore conclude that NRS 40.459(1)(c) is not simply a clarification of existing law, but is rather a new limitation on the amount that may be recovered in a deficiency judgment.

### *The right to a deficiency judgment is a vested right*

Sandpointe and Yahraus-Lewis next argue that even if NRS 40.459(1)(c) changed existing law, applying its limitation here

would not impact any of CML-NV's existing rights because CML-NV's right to a deficiency judgment only vests upon entry of the judgment, which has not yet occurred. They point out that in order to obtain a final deficiency judgment, CML-NV must first abide by several statutory requirements and overcome any defenses that may be raised. Thus, they insist, CML-NV merely has a "contingent remedy for a potential deficiency." Relying primarily on a passage from Corpus Juris Secundum (C.J.S.), Sandpointe and Yahraus-Lewis assert that applying NRS 40.459(1)(c)'s limitation here would not be retroactive because "it has generally been the law for more than half a century that 'no right to a deficiency judgment vests until Plaintiff satisfies equity that it would be equitable, in light of the sale price, to authorize a deficiency judgment.'" (quoting 59 C.J.S. *Mortgages* § 778, at 1474 (1949)). Notably, however, that very "assertion stated in the C.J.S. encyclopedia . . . is supported by no law." *Hartman v. McInnis*, 996 So. 2d 704, 722 (Miss. 2007) (Dickinson, J., concurring and dissenting) (explaining that the two cases cited in Corpus Juris Secundum arose in states that relied on equitable principles rather than on specific deficiency statutes).

In Nevada, the sale of the secured property is the event that vests the right to deficiency. Following the trustee's sale, the amount of a deficiency is crystalized because that is the subject date for determining both the fair market value and trustee's sale price of the property securing the loan. *See* NRS 40.459(1); *In re Filippini*, 66 Nev. 17, 22, 202 P.2d 535, 537 (1949) (defining a "vested right[ ]," in relevant part, as "some interest in the property that has become fixed and established"). In other words, the fair market value of the property is determined on the day of the trustee's sale, and that value can be used in a future deficiency action. Further, NRS 40.462(1), which governs the distribution of foreclosure sale proceeds, provides that the right to receive proceeds from the sale vests at the time of the foreclosure sale; it is logical that the right to a judgment for the amount *not* received in a foreclosure sale would arise on the same date as the right to receive amounts received from the sale. The trustee's sale marks the first point in time that an action for deficiency can be maintained and commences the applicable six-month limitations period. *See* NRS 40.455(1) (providing that an application for deficiency judgment must be filed "within 6 months after the date of the foreclosure sale or the trustee's sale"). Accordingly, we conclude that the right to deficiency vests upon the sale pursuant to a judicial foreclosure or trustee's sale, and thus, applying NRS 40.459(1)(c) to deficiencies arising from sales that took place before that provision was enacted would affect vested rights.

*Application of NRS 40.459(1)(c) in this case would have
a retroactive effect*

In reaching our conclusion, we rely on *Holloway v. Barrett*, 87 Nev. 385, 487 P.2d 501 (1971). *Holloway* arose from the Legislature's enactment of a statute that limited the amount of a deficiency judgment to the difference between the total amount owed on the loan and the fair market value of the property securing the loan. *Id.* at 387 n.1, 487 P.2d at 502 n.1. The borrowers in *Holloway* argued that this limitation should be applied to a loan that was executed prior to the effective date of the statute but that had resulted in a foreclosure sale after the statute's effective date. *Id.* at 386-88, 487 P.2d at 502-03. The district court agreed, determining that applying the limitation under those circumstances did not constitute retroactive operation. *Id.* at 387-88, 487 P.2d at 503.

The creditor challenged this determination by petitioning this court for a writ of mandamus. *Id.* at 389, 487 P.2d at 503. In denying the petition, the *Holloway* court characterized "the argument about retrospective and prospective application of [the statute]" as "purely academic." *Id.* at 390, 487 P.2d at 504. The court reasoned as follows:

> There is no attempt upon the part of the trial court to give [the statute] retrospective effect. *It is being applied to a deficiency occurring as a result of a trustee's sale held after the effective date of the statute.* The only retrospective aspect arises from the fact that the promissory note and the deed of trust were executed prior to the effective date of the statute and may for that reason affect rights already in existence.

*Id.* at 390-91, 487 P.2d at 504 (emphasis added).

The court drew a distinction based upon this fact, expressly noting that it was not considering "foreclosure and trustee's sales completed prior to the effective date of the statute[ ]," thereby foreshadowing the scenario presented here. *Id.* at 392 n.4, 487 P.2d at 506 n.4; *see Paradise Homes Corp. v. Eighth Judicial Dist. Court*, 87 Nev. 617, 619 n.1, 491 P.2d 1277, 1279 n.1 (1971).

Subsequently, in *Farmers Home Mutual Insurance Co. v. Fiscus*, this court characterized *Holloway* as concluding that "the trial court's order did not constitute retroactive application of a statute, but rather, that the deficiency judgment in question arose after the effective date of the statute." 102 Nev. 371, 376, 725 P.2d 234, 237 (1986). Therefore, this court explained, "[t]he statute in question in *Holloway* did not . . . impair preexisting obligations . . . *since the [trustee's sale] on the property occurred after the effective date of the statute.*" *Id.* (emphasis added). Thus, *Holloway* and *Farmers*, read together, demonstrate that statutes affecting de-

ficiency judgments operate prospectively when the sale, pursuant to a judicial foreclosure or trustee's sale, occurs after the enactment of the statute. In contrast, when, as here, the trustee's sale occurs before the effective date of an antideficiency statute, application of the statute will generally be deemed retroactive. *In re Mathiason*, 129 B.R. 173, 175-76 (Bankr. D. Minn. 1991) (reasoning that because the mortgage was foreclosed before the effective date of the statute, the statute could only apply if it operated retroactively); *Allstate Ins. Co. v. Furgerson*, 104 Nev. 772, 776, 766 P.2d 904, 907 (1988) (applying a new statute of repose to an action for construction defects substantially completed before the effective date of the statute would constitute retroactive operation because the "cause of action accrued before the effective date of the revised [statute]"); *see also Pub. Emps.' Benefits Program v. Las Vegas Metro. Police Dep't (PEBP)*, 124 Nev. 138, 155, 179 P.3d 542, 553 (2008) (stating that courts "take a 'commonsense, functional' approach" in analyzing whether applying a new statute would constitute retroactive operation (quoting *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 321 (2001))).

### NRS 40.459(1)(c) may only apply prospectively

Having concluded that applying NRS 40.459(1)(c) here would constitute retroactive operation of the statute, we now turn to whether it may, nonetheless, be applied retroactively. Although Sandpointe and Yahraus-Lewis do not concede that NRS 40.459(1)(c) is subject to the presumption against retroactivity, they argue that applying the statute here is consistent with the Legislature's intent.

The United States Supreme Court has explained that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf*, 511 U.S. at 265. And, from this court's inception, it has viewed retroactive statutes with disdain, noting that such laws are "odious and tyrannical" and "have been almost uniformly discountenanced by the courts of Great Britain and the United States." *Milliken v. Sloat*, 1 Nev. 573, 577 (1865). Not surprisingly, once it is triggered, the presumption against retroactivity is given considerable force. *See U.S. Fid. & Guar. Co. v. United States ex rel. Struthers Wells Co.*, 209 U.S. 306, 314 (1908) ("The presumption is very strong that a statute was not meant to act retrospectively, and it ought never to receive such a construction if it is susceptible of any other."). Thus, as we have observed, a statute will not be applied retroactively

> unless [(1)] the Legislature clearly manifests an intent to apply the statute retroactively, or [(2)] "it clearly, strongly,

and imperatively appears from the act itself'' that the Legislature's intent cannot be implemented in any other fashion.

*PEBP*, 124 Nev. at 154, 179 P.3d at 553 (quoting *In re Estate of Thomas*, 116 Nev. 492, 495-96, 998 P.2d 560, 562 (2000)).

### The Legislature did not clearly manifest an intent to apply NRS 40.459(1)(c) retroactively

In support of their argument, Sandpointe and Yahraus-Lewis principally rely on a passage from the Legislative Counsel Digest, providing that the relevant provisions of Assembly Bill 273 will ''become effective upon passage and approval and thus apply to a deficiency judgment awarded on or after that effective date.'' 2011 Nev. Stat., ch. 311, Legislative Counsel's Digest, at 1741. CML-NV responds that the Legislative Counsel's Digest cannot be considered in assessing whether the Legislature intended to apply NRS 40.459(1)(c) retroactively. It argues that the Legislative Counsel is an unelected body and that the above-quoted passage conflicts with the text and legislative history of NRS 40.459(1)(c).

·'' 'Where the language of a statute is plain and unambiguous and its meaning clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself.' '' *Walters v. Eighth Judicial Dist. Court*, 127 Nev. 723, 727, 263 P.3d 231, 234 (2011) (quoting *Madera*, 114 Nev. at 257, 956 P.2d at 120). Therefore, it is only appropriate to consult the Legislative Counsel's Digest to ascertain the intent of the Legislature ''[i]f the language of a statute is ambiguous.'' *Cal. Teachers' Ass'n v. Governing Bd. of Cent. Union High Sch. Dist.*, 190 Cal. Rptr. 453, 457 (Ct. App. 1983). Stated differently, ''[i]f a law is clear the Legislative Counsel's Digest must be disregarded.'' *Id.* at 458.

Here, the Legislature simply provided that NRS 40.459(1)(c) ''become[s] effective upon passage and approval.'' 2011 Nev. Stat., ch. 311, § 7, at 1748. As the district court determined, this statement does not even begin to approach the type of express legislative command necessary to rebut the presumption against retroactivity. *See Landgraf*, 511 U.S. at 257 (''A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.''); *PEBP*, 124 Nev. at 155, 179 P.3d at 553 (''[W]hen the Legislature intends retroactive application, it is capable of stating so clearly.''). And, although this statement is cursory, it is not ambiguous. There is clearly no evidence in the enactment language that shows the Legislature's intent to apply NRS 40.459(1)(c) retroactively. Resort to the Legislative Counsel's Digest or other

legislative materials is therefore unnecessary. Even if we were to determine that the effective date language of NRS 40.459(1)(c) is ambiguous, such a determination would necessarily compel a conclusion that the Legislature did not *clearly manifest* an intent to apply the statute retroactively.

> *Nothing in NRS 40.459(1)(c) clearly, strongly, and imperatively shows that the Legislature's intent can only be implemented by applying the statute retroactively*

NRS 40.459(1)(c) would certainly have a broader impact if it were applied retroactively. That does not mean, however, that the Legislature's intent can only be implemented by applying it retroactively. *See Landgraf*, 511 U.S. at 285-86 ("It will frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity."). NRS 40.459(1)(c) imposes a dramatic limitation on the amount of a deficiency judgment that a successor in interest can recover, and even if the statute is applied prospectively, it could still reach a large portion of the secondary mortgage market for distressed loans. Therefore, it does not clearly, strongly, and imperatively appear from the language of NRS 40.459(1)(c) that the Legislature's intent can only be implemented by applying the statute retroactively and, as a consequence, the presumption against retroactivity has not been rebutted.

Any lingering doubt regarding whether the Legislature intended NRS 40.459(1)(c) to apply retroactively is quickly put to rest by reference to its legislative history. Although the language of the enactment provision is clear and unambiguous, and reference to legislative history is therefore generally not needed, *Landgraf*, 511 U.S. at 257; *PEBP*, 124 Nev. at 155, 179 P.3d at 553, in this case it simply clarifies that there was no intent that NRS 40.459(1)(c) was meant to apply retroactively. Throughout the various committee hearings, Assemblyman Conklin, the author of Assembly Bill 273, stated that the provisions could not be applied retroactively. *See* Hearing on A.B. 273 Before the Senate Judiciary Comm., 76th Leg., at 2-3 (Nev., May 3, 2011); Hearing on A.B. 273 Before the Assembly Commerce and Labor Comm., 76th Leg., at 12-13 (Nev., March 28, 2011); Hearing on A.B. 273 Before the Assembly Commerce and Labor Comm., 2011 Leg., 76th Leg., at 7 (Nev., March 23, 2011).[3] Given the above points, NRS

---

[3]Sandpointe and Yahraus-Lewis contend that the statements made by Assemblyman Conklin no longer apply because the language of the provision was changed. We find no merit in this assertion. Although some changes were made to the provision regarding the effective date of the statute, the Legislative intent against retroactive application is still relevant for our consideration.

40.459(1)(c) cannot be applied retroactively.[4] In determining that NRS 40.459(1)(c) cannot apply retroactively, we necessarily also conclude that NRS 40.459(1)(c) is not applicable to the factual circumstances in this petition.[5]

## CONCLUSION

We conclude that NRS 40.459(1)(c) is a new statute that impacts vested rights. If a statute affects vested rights, it may not apply retroactively unless such intent is clearly manifested by the Legislature. We conclude that pursuant to the language in Assembly Bill 273, regarding the effective date of NRS 40.459(1)(c), the statute may not apply retroactively. Additionally, there is no clear or strong evidence that supports application of this statute retroactively. Therefore, because the trustee's sale in this petition occurred before the statute became effective, the limitations in NRS 40.459(1)(c) cannot apply here. Accordingly, we conclude that the district court did not act arbitrarily or capriciously in either denying Sandpointe's and Yahraus-Lewis's motion for partial summary judgment or in granting CML-NV's motion for partial summary judgment. We, therefore, deny the petition for extraordinary relief.

PICKERING, C.J., and GIBBONS, HARDESTY, and DOUGLAS, JJ., concur.

CHERRY, J., with whom PARRAGUIRRE, J., joins, dissenting:

I respectfully dissent from my colleagues in the majority. I would grant the original petition for a writ of mandamus or prohibition because, to date, the real party in interest has not obtained a deficiency judgment. I believe that when a deficiency judgment is lawfully obtained from a court of competent jurisdiction, it is at that time that NRS 40.459(1)(c) would apply. This is, of course, contrary to the majority holding that the limitations in NRS 40.459(1)(c) apply to foreclosure or trustee's sales occurring on or after the effective date of the statute.

---

[4]We also note that the presence of several potential constitutional and procedural issues, including the Contracts Clause and federal preemption by the Financial Institutions Reform, Recovery, and Enforcement Act, weighs against retroactively applying NRS 40.459(1)(c) here. *See Landgraf,* 511 U.S. at 267 n.21 ("In some cases, . . . the interest in avoiding the adjudication of constitutional questions will counsel against a retroactive application."). Because NRS 40.459(1)(c) is inapplicable in this case, we need not reach these issues.

[5]CML-NV contends that NRS 40.459(1)(c), which contemplates "acquir[ing] the right to obtain the judgment from a person," cannot apply under these circumstances because the FDIC is not a person as defined by NRS 0.039. However, we need not determine this issue because we conclude that NRS 40.459(1)(c) does not apply here, where the trustee's sale occurred before NRS 40.459(1)(c) became effective.

Although I am deeply troubled by the majority's rejection of Sandpointe's and Yahraus-Lewis's argument that NRS 40.459(1)(c) merely clarified existing limitations on a creditor's recovery set forth in NRS 40.451, even if I were to accept this determination, in my view, NRS 40.459(1)(c)'s protections would nonetheless act to limit the amount of CML-NV's recovery. Before a final deficiency judgment can be obtained, a creditor must comply with the various requirements of Nevada's deficiency legislation and overcome any defenses asserted by the borrower and/or the guarantor. As Sandpointe and Yahraus-Lewis correctly assert, until such a judgment has been obtained, a creditor merely has a "contingent remedy for a potential deficiency," not a vested right to a deficiency judgment. As a result, the application of NRS 40.459(1)(c) in cases, like the one presented here, in which a deficiency judgment had not yet been obtained by the statute's effective date cannot be viewed as having a retroactive effect on a creditor's right to recover. *See Pub. Emps.' Benefits Program v. Las Vegas Metro. Police Dep't (PEBP)*, 124 Nev. 138, 155, 179 P.3d 542, 553-54 (2008) (concluding that " '[a] statute has retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past' " (alteration in original) (quoting *Immigration & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 321 (2001))).

That the Legislature intended NRS 40.459(1)(c) to operate in this fashion is made clear by the Legislative Counsel Digest's pronouncement that the relevant provisions of Assembly Bill 273 would not only "become effective upon passage and approval" but would also "apply to a deficiency judgment awarded on or after that effective date." 2011 Nev. Stat., ch. 311, Legislative Counsel's Digest, at 1741. This statement is instructive in that it confirms that it is the act of obtaining a deficiency judgment, not the holding of a foreclosure or trustee's sales, that triggers the application of NRS 40.459(1)(c). The majority declines to consider this language because they conclude that resorting to legislative intent is unnecessary. The Legislature, however, concerned that this court might improvidently interpret this statute in light of the arguments advanced by real party in interest, unequivocally emphasized and declared in its amicus curiae brief its clear intent that NRS 40.459(1)(c) "apply to *every deficiency judgment awarded on or after its effective date*." (Emphasis added.) But in resolving the important issues presented here, the majority fails to acknowledge the Legislature's participation in this matter, much less address the statement of intent contained in its brief as to the statute's correct operation.

While the Great Recession from which our state has only just begun to emerge began in 2008, it was not until June 10, 2011,

that the Governor signed Assembly Bill 273 into law, codifying the limitation on deficiency judgment recoveries at issue here as NRS 40.459(1)(c). This statute was specifically designed to put a stop to profiteering activities brought on by the emergence during the Great Recession of a secondary market for distressed loans in which third parties swooped in to purchase these loans at deeply discounted prices, exercised their power of sale or judicial foreclosure on the property securing the loans, and then sought deficiency judgments against the debtors and guarantors with the blind hope that there still may be a solvent target. *See* Hearing on A.B. 273 Before the Assembly Commerce and Labor Comm., 76th Leg. (Nev., March 23, 2011). In order to encourage creditors to negotiate with the borrowers of these loans, rather than sell them to third parties for "pennies on the dollar," Hearing on A.B. 273 Before the Senate Judiciary Comm., 76th Leg. (Nev., May 3, 2011), NRS 40.459(1)(c) greatly limits the amount of a deficiency judgment that a successor party can recover.

This court has long recognized that "Nevada's deficiency legislation is designed to achieve fairness to all parties to a transaction secured in whole or in part by realty." *First Interstate Bank of Nev. v. Shields*, 102 Nev. 616, 618, 730 P.2d 429, 431 (1986). In *Shields*, we explained that for obligors, fairness was accorded by ensuring that "creditors in Nevada may not reap a windfall at an obligor's expense by acquiring the secured realty at a bid price unrelated to the fair market value of the property and thereafter proceeding against available obligors for the difference between such a deflated price and the balance of the debt." *Id.* To that end, *Shields* recognized that "[i]t is irrefutably clear that the salutary purposes of the legislative scheme for recovering legitimate deficiencies would be attenuated, if not entirely circumvented . . . by denying guarantors, or any other form of obligors, the protection provided by the deficiency statutes." *Id.* at 618-19, 730 P.2d at 431. This is so, the *Shields* court concluded, because in Nevada lenders are not permitted to "manipulate sources of recovery in order to realize debt satisfaction in amounts substantially greater than the balance of the debt due." *Id.* at 619, 730 P.2d at 431.

While the creditor activities at issue here are obviously different than those addressed in *Shields*, the policy rationale underlying Nevada's deficiency legislation, including the newly enacted NRS 40.459(1)(c), remains the same—achieving "fairness to *all parties* to a transaction secured . . . by realty." *Id.* at 618, 730 P.2d at 431 (emphasis added). But in denying the petition for extraordinary relief brought by Sandpointe and Yahraus-Lewis, the majority turns this policy on its head. By limiting NRS 40.459(1)(c)'s protections so that they apply only when a foreclosure or trustee's sale had not taken place prior to the statute's effective date, rather than allowing their application in cases where a deficiency judgment had not

been obtained by that date, the majority denies these protections not only to Sandpointe and Yahraus-Lewis, but to innumerable similarly situated borrowers and guarantors, the individuals and entities that this statute was specifically designed to assist.

In essence, the majority's decision serves to produce a windfall for collection agencies and other third-party purchasers of distressed loans through the very activities—the sale and purchase of such loans for pennies on the dollar, followed by the sale of the property securing the loans and efforts to recover the full indebtedness through a deficiency judgment—that the Legislature sought to address with the passage of Assembly Bill 273. And in so doing, the majority abrogates the clear intent of Nevada's Legislature in passing Assembly Bill 273 (NRS 40.459(1)(c)), which was to encourage lenders to negotiate with the borrowers and, by extension, the guarantors of these loans, rather than sell them to collection agencies and other third-party purchasers for far less than their original value.

The facts of this case are illustrative of why it is so important that the act of obtaining a deficiency judgment be the trigging event for the application of NRS 40.459(1)(c). Here, the original lender, Silver State Bank, was closed in 2008, with the FDIC appointed as receiver. As a result, when Sandpointe's loan matured and subsequently went into default in 2009, the FDIC was effectively the lender for this loan, meaning that, rather than having a local lender to negotiate with, Sandpointe and Yahraus-Lewis had only the negligible prospect of reaching out to this monolithic government entity. The FDIC, however, quickly shuttled the Sandpointe loan off to Multibank in 2010, and Multibank then transferred it to its wholly owned subsidiary, CML-NV, which foreclosed on the loan and sold the collateral securing it at a trustee sale in early 2011. Under the position adopted by the majority, the occurrence of the trustee sale at this point meant that Sandpointe and Yahraus-Lewis would not receive the protections afforded by NRS 40.459(1)(c), even though the prospect of negotiations on their loan had been all but eliminated by the failure of their original lender and the resulting scenario in which three separate entities, including the FDIC, had control of the loan over the course of a few years.

And one last thought. Even if NRS 40.459(1)(c) was applied, as I believe it should be, to limit a successor's recovery to the difference between the fair market value of the property and the amount the successor paid to acquire its interest, Sandpointe and Yahraus-Lewis, along with similarly situated borrowers and guarantors, would still be liable for a great amount of money to the successor to the loan.

For the above reasons, I dissent.